### Norfolk

DAVID L. MARTIN, et al.

v.

## THE SCHOOL BOARD OF PRINCE GEORGE COUNTY

No. 0994-85

Decided October 7, 1986

198

COUNSEL

Peter W.D. Wright, for appellant.

Kathleen S. Mehfoud (Lacy & Mehfoud, P.C., on brief), for appellee.

OPINION

**BENTON, J.** — This case concerns the responsibility of the School Board of Prince George County (the School Board) under state and federal law to educate David Martin, a handicapped youth. David and his parents appeal from the final judgment of the circuit court which reversed the decisions of administrative hearing officers that required the School Board to place David in a residential program. Exercising our jurisdiction under Code § 17-116.05(1),[1] we conclude that the decision of the circuit court was

---

[1] Code § 17-116.05 provides in part:

Any aggrieved party may appeal to the Court of Appeals from: 1. Any final decision of a circuit court on appeal from a decision of an administrative agency.

not plainly wrong and affirm the judgment. Code § 8.01-680; *Dwyer v. Yurgaitis*, 224 Va. 176, 178, 294 S.E.2d 792, 793 (1982).

David is the adopted son of John and Charlotte Martin. According to his parents, David was physically abused by his natural father and his foster parents. Reports by mental health professionals indicate that he suffers serious emotional disabilities, such as lack of self-esteem and an inability to check his aggressive impulses or accept responsibility for his actions. David's performance on various tests place him in what is described as the low-average to average range of intelligence. According to school reports and tests, David performed well in reading tasks but suffered a learning disability in mathematics.

The controversy in this case involves the School Board's obligation to educate David in accordance with the Education For All Handicapped Children Act (the Act), 20 U.S.C. §§1400-1420 (1982), and the Virginia special education statute, Code §§ 22.1-213 to 22.1-221. To receive federal funds for its special education programs the Commonwealth must have in effect "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1) (1982). The Virginia special education statute expresses such a policy, Code §§ 22.1-214-15, and mandates to the State Board of Education the responsibility for implementation of this policy by the local school divisions. Code § 22.1-214.

---

The federal and state statutes involved in this case both provide for review by a state administrative agency of local school authorities' actions regarding the education of handicapped children. 20 U.S.C. § 1415 (1982); Code § 22.1-214(B). The federal statute provides that a party aggrieved by an administrative hearing "may appeal to the State educational agency which shall conduct an impartial review of such hearing." 20 U.S.C. § 1415(c)(1982). The State Board of Education, which is responsible for compliance with the requirements for receipt of federal assistance for special education programs, has adopted regulations which establish a two-tier administrative review process by the Department of Education to implement Code § 22.1-214 and 20 U.S.C. § 1415. The initial due process hearing is conducted by a hearing officer whose decision is the final decision of the Department, unless the decision is appealed. If the hearing officer's decision is appealed, the decision of the administrative reviewing officer is final, unless an action is commenced in the appropriate state or federal court to review the agency decision. *See* Virginia Department of Education, Officer of Special and Compensatory Education, *Regulations Governing Special Education Programs for Handicapped Children and Youth in Virginia* [State Regulations] II C.(1) j.-k. (1984); Code § 22.1-214.

Both the Act and the Virginia statute manifest an intention that local school divisions educate each handicapped child according to the child's unique needs and capabilities. The central instrument for carrying out this intention is the "individualized education program" (IEP). The IEP is a written document developed after a meeting between a handicapped child's parents, his teacher, and a qualified representative of the local school division. 20 U.S.C. § 1401(19) (1982); State Regulations II(B)(2). The IEP must contain specified information regarding the child, including the present levels of educational performance, annual goals, short-term instructional objectives, the specific educational services to be provided, and the extent to which such child will be able to participate in regular educational programs. 20 U.S.C. § 1401(19)(1982). The local school division must review the IEP at least annually and make appropriate revisions to the document. *See* 20 U.S.C. § 1414(a)(5) (1982); State Regulations II (B)(2)(c)(2). Furthermore, each IEP must comply with the Act's requirement that each state establish:

> procedures to assure that, *to the maximum extent appropriate*, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicapped is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B)(1982) (emphasis added); *see also* State Regulations II(B)(1)(d) ("least restrictive environment" requirement).

In some cases, however, the local school division may not be able to educate a handicapped child in regular or special classes. Under such circumstances, the Act requires placement in a residential program. *See* 20 U.S.C. § 1413 (a)(4)(B)(i) (1982); 34 C.F.R. § 300.302 (1985). The Virginia statute provides for residential placement as follows:

> If a school division is unable to provide a free appropriate public education to a handicapped child and it is not appro-

priately available in a state facility, it shall offer to place the child in a nonsectarian private school for the handicapped approved by the Board of Education or such other licensing agency as may be designated by state law. The school board of such division shall pay to, or on behalf of, the parent or guardian of such child the reasonable tuition cost and other reasonable charges as may be determined by the Board of Education.

Code § 22.1-218(A); *see* State Regulations II (B)(1)(c)(2).

■ The placement of a handicapped child is not a decision that can be made in a mechanical fashion by referring to a fixed schedule of placements without regard to the child's particular educational needs. State Regulations II(B)(1)(c). A local school division's basic obligation under federal and state law is to provide "free appropriate public education." The continuum of placements derived from the "least restrictive environment" requirement, a significant aspect of the education of handicapped children, is but one consideration in the determination of which placement will satisfy that basic obligation.

After attending Dinwiddie Elementary School until Grade 6, David was tested in 1978 and placed in a program for emotionally disturbed (ED) children at the school. Disciplinary problems caused his removal from the program, and David was sent to the Commonwealth Psychiatric Center (later known as the Psychiatric Institute of Richmond) in June, 1979 for an evaluation.

David was placed in a learning disabled program at Clements Junior High School in August, 1979. Disciplinary problems caused his removal from the school and placement at the Jacob Silverberg Academy, a part of the Commonwealth Psychiatric Center. David was rejected for residential placement by a private institution in Norfolk and remained at the Jacob Silverberg Academy for three semesters, from January, 1980 to June, 1981. At the Academy, he was placed in a structured ED classroom and received counseling. A Richmond neurologist examined David in August, 1980, concluded that David's problems were predominantly emotional, and indicated that he would support a residential placement if David's parents sought such a placement. In November, 1980, David was admitted to the Psychiatric Institute of Richmond after engaging in a sexual act with a five-year old

relative.

In March, 1981, David was discharged from the Psychiatric Institute and returned home; however, he continued as a day student at the Psychiatric Institute's Educational Development Center (successor to the Jacob Silverberg Academy). A report by a psychological counsellor, dated May 8, 1981, noted that David appeared ready to be returned to the public schools. The report also indicated that David's mother reported that he exhibited less control at home and that she believed a residential placement was warranted. The counsellor recommended a residential placement because of the "disparity between his behaviors." A majority of the special education eligibility committee of the Prince George County Schools voted in August, 1981 to place David in a self-contained ED classroom at Dinwiddie Junior High School. Kenneth Bussey, the school psychologist, issued a "minority report" stating that the ED placement was not sufficiently restrictive to provide for David's needs and that residential placement "is both warranted and prudent." The majority recommendation was implemented in September, 1981, with the consent of David's mother.

At the junior high school, David was "mainstreamed" for three class periods each day and placed in a self-contained classroom for one and one-half hours. His behavior at home apparently deteriorated; a series of violent episodes at home caused his readmission to the Psychiatric Institute in May, 1982. A psychologist at the Psychiatric Institute informed the Prince George County School authorities that David was emotionally unable to return to school.

A Psychiatric Institute instructional summary, dated June 13, 1982, recommended instruction in a "structured environment" and close observation to reduce the potential of aggressive behavior. David was discharged in July, 1982 with the observation that his parents were considering the option of residential placement if "David does not fit in with the best interests of the family." The United Methodist Children's Home in Richmond informed the parents that David's attitude toward his peers and his medication requirement prevented his placement in the Home.

In July, 1982, the Prince George County school psychologist concluded that David needed to be placed in a self-contained ED classroom, and recommended that he become involved in prevoca-

tional activities and vocational preparation. With the permission of David's mother, the eligibility committee placed David in a self-contained ED class at Moore Junior High School which offered learning disability resources, counselling, and vocational training. School records indicated that David was mainstreamed for three daily class periods and placed in a self-contained setting for two daily class periods. David assaulted his parents in November and December, 1982, and was placed in a detention home for one week.

In December, 1982, the eligibility committee voted to pay the educational costs of a private school placement. Minutes of the committee meeting noted that David's parents were afraid of his behavior and could not afford residential placement at the Methodist Home.

David was readmitted to the Psychiatric Institute in May, 1983, after a series of violent acts. The Psychiatric Institute cautioned that mainstreaming proceed carefully in the upcoming school year and opined that residential placement might be necessary. David's behavior deteriorated at the Psychiatric Institute, and he was admitted to Central State Hospital on July 6, 1983.

Testing at the hospital placed David in the average range of intelligence; the psychologist reported that low scores in cognitive reasoning accounted for David's difficulties in mathematics. Psychological examination revealed a number of emotional problems related to his experiences as a child. A psychologist concluded that David suffered no form of mental illness and should not be placed in a long-term psychiatric treatment facility. The psychologist recommended placement in a residential program for adolescents with conduct and learning problems. David was discharged from Central State Hospital on January 5, 1984.

In December, 1983, David's parents requested that the Prince George County school system place David in a residential setting with special education services. On March 6, 1984, the school system proposed an IEP of self-contained ED instruction with learning disability resources in mathematics. David's parents rejected the proposal on March 21 and requested the administrative review available under the Act.

A hearing officer appointed by the Department of Education heard testimony over three days, received 191 exhibits and made over 60 findings of fact. The hearing officer concluded that the School Board's proposed placement was deficient in three aspects. First, the School Board could not meet its obligation of providing David with vocational training because "mainstreaming had proved to be a failure." Second, the proposed placement would not permit David to receive a high school diploma by earning Carnegie credits. The hearing officer noted that the School Board was under no legal obligation to ensure that David in fact received a high school diploma, but concluded that, under the circumstances of the case, the proposed placement would deny the youth "a significant opportunity which he might otherwise be able to achieve, even with his disabilities." Third, the proposed placement raised serious concerns in terms of dealing with David's emotional disability. The hearing officer observed:

> In light of the fact that David has consistently had difficulty in relating to peers, the lack of any realistic opportunity to mix with peers in a school setting must be regarded as a serious shortcoming.

The hearing officer further concluded:

> [A] structural residential placement which would provide vocational or occupational therapy and training to deal with the emotional barriers to his employability, including his relationship with supervisors and co-workers, is required. In addition, David Martin continues to need special education resources or services to deal with his learning disabilities primarily in math. David's placement should, if reasonably possible, include the opportunity for continued psychotherapy, *although this is not required as an educational component of his placement*. (emphasis added).

An administrative review officer appointed by the Department of Education heard additional testimony and affirmed the hearing officer's decision. The review officer noted in a written opinion:

> In dealing with a seriously emotionally disturbed child . . . a determination of whether [meaningful access to public education] can be met only in a residential placement or can

be met by a placement offered in the local school setting is subjective.

The School Board then filed a motion for judgment in the circuit court.[2] The court first denied the Martins' request for an order directing the School Board to provide tuition assistance for a 24-hour residential placement. The court subsequently concluded that David was receiving benefit from and making progress in the School Board's program and therefore had received a "free appropriate public education" as that term was understood in *Board of Education v. Rowley*, 458 U.S. 176 (1982). The circuit court also concluded as follows:

> [T]he hearing officer confused educational instruction with treatment and placed a greater requirement upon the Board regarding Martin's progress or "benefit from the instruction" than is required by the law as stated in *Rowley*.

> The Court perceives that the hearing officer's concern, well-intended as it was, was focused upon the total social and behavioral needs of Martin. Martin's sociological/psychological problems are or should be properly addressed by the Mental Health authorities or Juvenile Court Services of the Department of Corrections.

The Act defines "free appropriate public education" as follows:

> [S]pecial education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the

---

[2] The Act and the Virginia statute both provide that an aggrieved party may bring a "civil action," in which the court:

shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2)(1982); Code § 22.1-214(D). The scope of review under this grant of jurisdiction is broader than that applicable to appeal of agency decisions under the Administrative Process Act, in which the "substantial evidence" test controls. *Cf.* Code § 9-6.14:17; *Atkinson v. Virginia Alcoholic Beverage Control Commission*, 1 Va. App. 172, 176, 336 S.E.2d 527, 529-30 (1985).

State involved, and (D) are provided in conformity with the individualized education program.

20 U.S.C. § 1401(18) (1982). The Virginia statute states the local school division's obligation by using the term "special education:"

> "Special education" means classroom, home, hospital, institutional or other instruction, including physical education and vocational education, *to meet the reasonable educational needs* of handicapped children, transportation, and related *services required or appropriate to assist handicapped children in taking advantage of, or responding to, educational programs and opportunities commensurate with their abilities.*

Code § 22.1-213(2) (emphasis added).

■ In *Board of Education v. Rowley*, upon which the circuit court relied, the Supreme Court concluded that the "free appropriate public education" requirement is satisfied "by providing personalized instruction with sufficient support services to permit the child *to benefit educationally* from that instruction." 458 U.S. at 203 (emphasis added). The Court cautioned, however, that it was not establishing a single test to determine the adequacy of educational benefits, and instead limited its analysis to the circumstances of Amy Rowley's education. *Id.* at 202, 209-10.

■ We assume in this case, as the parties apparently do, that the Virginia statute does not require more than the Act. Although the School Board was under no obligation to provide maximum educational benefit to David, *see Rowley*, 458 U.S. at 198, both the Act and the Virginia statute call for more than some minimal educational benefit to a handicapped child. *See Hall v. Vance County Board of Education*, 774 F.2d 629, 636 (4th Cir. 1985). The determination of the sufficiency of educational benefit is a difficult task, and must proceed with particular concern for the unique needs of the handicapped child. *See Rowley*, 458 U.S. at 202. We conclude from an examination of the record that the circuit court properly determined that the proposed IEP would enable David to benefit educationally.

Upon his return in January 1984 to the Prince George County school system from Central State Hospital, David received considerable attention from two teachers, Julie Simon and Sylvia Pope. Pursuant to the proposed IEP, agreed to by David's mother as an interim placement pending a determination of the Martins' request for a residential placement, David was placed in Ms. Simon's "self-contained" class for emotionally disturbed students for five class periods each day; he was the only student in the class for the remainder of the school year. Ms. Simon testified that David made academic progress in her class. His frustration, particularly in doing mathematics, was decreased by using a problem-solving approach and a technique Ms. Simon called "antiseptic bouncing:" moving to other subjects until David calmed down. In the first full grading period after his return to the public school David received B's in all subjects except mathematics, in which he received a C.

David also spent one class period four days each week in Mrs. Pope's resource class for students with learning disabilities. In this class David received personalized instruction in mathematics. Mrs. Pope testified that David did fairly well in his work, but that he needed specific directions, reinforcement and encouragement to complete his assignments. Mrs. Pope also said that David had a low level of concentration and had difficulty in abstract, nonverbal reasoning. She described him as being willing to attack mathematical problems, although he might say: "I don't want to do it;" she said this represented a change from his former attitude of: "I can't do it."

Mrs. Pope testified that David had not been physically or verbally aggressive toward her or his classmates. David was disciplined twice in the spring of 1984, once for yelling on the school bus and once for being in an unauthorized area out of school officials' view.

The IEP rejected by David's parents proposed that David attend Ms. Simon's self-contained class for three periods each day, and Mrs. Pope's resource class for one period four days each week, and be mainstreamed for two periods each day in Art I and Beginning Guitar classes. Although Ms. Simon had recommended that, in addition to instruction in her and Mrs. Pope's classes, David spend three class periods at the Rowanty Technical School where he could be taught by an instructor qualified to work with

special education students, the IEP did not contain a specific goal dealing with David's vocational training.

It is reasonable to conclude that the personal instruction David received from Ms. Simon and Mrs. Pope explains in great part the academic progress both teachers described. The record of his previous placements indicates that mainstreaming did not yield positive results for David. In concluding that mainstreaming had failed, the hearing officer relied primarily on the opinion of Dr. Lordi, who had worked with David at the former Commonwealth Psychiatric Center and at the time of the hearing was David's psychotherapist.

Dr. Lordi said that David suffered from attention deficit disorder, which he characterized as:

> a biological inheritable deficit manifesting itself in the ability to attend, having short attention span, being [distractible], being concrete in thinking, having difficulty handling impulses, affecting in a secondary way the capacity to learn. By that I mean the [ability] to process what one hears, what one reads, what one remembers or doesn't remember, [is] seriously affected by this disability.

Dr. Lordi described David's placement as "moderately appropriate," but concluded that David could not be mainstreamed and instead required a residential setting in which he could receive around-the-clock reinforcement of acceptable behaviors. Dr. Lordi testified that David's "prognosis" was poor if an intensive residential placement was made not available to him. Dr. Lordi said that he meant by "poor:"

> Poor in the major areas of living. Poor in terms of being able to be self sustaining, self-supporting . . . . We are dealing fundamentally with a fellow who has potentially sufficient intelligence if handled properly to be a freestanding man one day.

> Without this other program he will never realize that. I do feel he will get more disturbed emotionally because he will have repeated failures. The tasks of life go on. If he isn't equipped for them he goes down.

So I would say very poorly, poor emotionally and poor academically unless he receives a much more intensive program than is available now.

Dr. Donna Elder, a clinical psychologist, performed a clinical evaluation of David at the request of Prince George County school authorities. Dr. Elder agreed that David suffered from attention deficit disorder, but said that a residential placement normally is not indicated for a child with attention deficit disorder. Dr. Elder recommended that David continue to receive instruction for emotionally disturbed children, focusing on impulse control, building self-esteem, coping with sexuality, completing assignments and complying with school rules. She also said David still needed learning disability instruction in mathematics and remedial instruction in spelling and written language.

As the circuit court suggested, the School Board is not responsible primarily for treatment of David's emotional disability. Nevertheless, the School Board was required to offer a residential placement in which David would receive both educational instruction and intensive professional attention for his learning disability, if a free appropriate public education could not be provided by a less restrictive placement. This determination is not a simple task for the professional educators who were directly involved in preparing an IEP for David.

It is no less difficult for a court presented with the issue of residential placement to separate medical, social and educational problems. *See North v. District of Columbia Board of Education,* 471 F. Supp. 136, 141 (D.D.C. 1979). No single test can include the numerous factors that local school authorities must consider in discharging the obligation imposed by the Act and the Virginia statute. Moreover, the mandate that educational instruction be tailored to each handicapped child's unique needs requires judicial review to proceed more or less on a case-by-case basis. We do find helpful the court's statement in *Kruelle v. New Castle County School District,* 642 F.2d 687 (3d Cir. 1981):

Analysis must focus . . . on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the

learning process.

*Id.* at 693; *see also McKenzie v. Smith*, 771 F.2d 1527, 1534-35 (D.C. Cir. 1985). The relevant inquiry in a case such as this is whether a residential placement was "a necessary ingredient for learning." *See Kruelle*, 642 F.2d at 694.

The circuit court essentially answered this question in the negative. One might reasonably conclude from the extensive administrative record that David's emotional disability could be addressed more thoroughly in a residential setting. The record shows that his disability has manifested itself in emotional outbursts and occasional acts of violence at school and at home. Certainly, David's emotional disability has intruded on the learning process and frustrated the instructional efforts outlined in various IEP's. It would be possible to conclude, therefore, that a residential placement would provide greater educational benefit than David received in the special education classes.

The record also demonstrates by a preponderance of the evidence, however, that David made significant progress in the special education classes taught by Ms. Simon and Mrs. Pope. This progress is one factor to be considered in assessing the School Board's obligation under the Act and the Virginia statute. *See Rowley*, 453 U.S. at 203-04. More important, we cannot conclude from the record that this case presents a situation in which a residential setting is the only educational placement "reasonably calculated to enable [the child] to receive educational benefits." *Hall v. Vance County Board of Education*, 774 F.2d at 635; *see also Abrahamson v. Hershman*, 701 F.2d 223, 227-28 (1st Cir. 1983); *Gladys J. v. Pearland Independent School District*, 520 F. Supp. 869, 877-79 (S.D. Tex. 1981); *San Francisco Unified School District v. State*, 131 Cal. App. 3d 54, 71, 182 Cal. Rptr. 525, 535-36 (1982); *In re "A" Family*, 184 Mont. 145, 155, 602 P.2d 157, 163 (1979). Although a residential placement might provide greater educational benefit, by offering a structured environment in which David's emotional disability could receive 24 hour attention, we conclude from his significant progress in a less restrictive setting that the School Board met its obligation under the Act and the Virginia statute.

The circuit court denied the Martins' request for a preliminary injunction to compel the School Board to provide tuition assis-

tance for a residential placement. In a letter ruling the court noted the Act's "status quo" provision, 20 U.S.C. § 1415(e)(3),[3] and relied on the decision in *Stemple v. Board of Education*, 623 F.2d 893 (4th Cir. 1980), *cert. denied*, 450 U.S. 911 (1981). Our decision on the substantive claim under the Act and the Virginia statute makes it unnecessary to determine whether the court properly denied the request for a preliminary injunction, and we express no view on whether a court may issue an injunction to compel a residential placement. *See generally Mathews v. Davis*, 742 F.2d 825 (4th Cir. 1984); *Gary B. v. Cronin*, 542 F. Supp. 102 (N.D. Ill. 1980); *Papcoda v. State*, 528 F. Supp. 68 (D. Conn. 1981). We note, however, that after the circuit court's ruling in this case the Fourth Circuit concluded that the Supreme Court decision in *Burlington School Committee v. Department of Education*, 105 S. Ct. 1996 (1985) (holding that the Act authorized retroactive reimbursement of tuition to parents who had disagreed with a public-school placement and had placed their child in a residential institution) had superseded *Stemple. Hall v. Vance County Board of Education*, 774 F.2d at 633-34.

Finally, the Martins note that approximately two years have passed from their original request for a residential placement, in 1983, to proceedings in this Court, and ask that we extend David's right to a free appropriate public education for a comparable period of time beyond his twenty-second birthday. The administrative and judicial review available to the parents of a handicapped child, a significant aspect of the Act and the Virginia statute, is lengthy. Where a court determines that school authorities have not met their obligations under the Act a strong argument can be advanced that a handicapped child is entitled to compensatory educational services to make up for the failure to comply with the Act. *See Max M. v. Thompson*, 592 F. Supp. 1450, 1457-58 (N.D. Ill. 1984); *Campbell v. Talladega County Board of Education*, 518 F. Supp. 47, 55-56 (N.D. Ala. 1981). *But see Adams Central School District No. 090 v. Deist*, 214 Neb. 307, 325, 334 N.W.2d 775, 786, *cert. denied*, 464 U.S. 893 (1983). *See generally* Comment, *Compensatory Educational Services and the Edu-*

---

[3] 20 U.S.C. § 1415(e)(3) provides in part:

During the pendency of any proceedings conducted pursuant to [provisions for administrative appeals and judicial review], unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child.

*cation for All Handicapped Children Act*, 1984 Wis. L. Rev. 1469.

Our conclusion that the School board satisfied its obligations under the Act and the Virginia statute makes it unnecessary to address the appellants' request. Moreover, we note that the request was not presented initially to the circuit court for its consideration. *See* Rule 5A:18. And we would be reluctant to overlook the fact that it was not raised in the circuit court because the request appears only in the conclusion to appellants' brief and was not made the subject of argument. We therefore express no opinion as to whether the legislatively fixed age groups for whom the School Board must provide a free appropriate public education can be enlarged.[4]

We cannot say that the decision of the circuit court was plainly wrong; therefore, the judgment of the circuit court is affirmed for the reasons expressed above.

*Affirmed.*

Hodges, J., and Keenan, J., concurred.

---

[4] The School Board's obligation is to provide a free appropriate public education to handicapped children between the ages of two and twenty-one, inclusive. Code §§ 22.1-213(1), 22.1-214(A); *see also* 20 U.S.C. § 1412 (1982). The Virginia statute provides that the State Board of Education "*may* prepare and place in operation [a program of special education] for such individuals of other ages." Code § 22.1-214(A) (emphasis added).