## CIRCUIT COURT OF STAFFORD COUNTY

Susan Gill,
an infant, et al.

v.

Stafford County
School Board

January 14, 1992

Case No. (Chancery) 152–91

BY JUDGE JAMES W. HALEY, JR.

This case was heard on August 1, 1991. Both counsel desired to brief the questions raised after review of the Circuit Court trial transcript. For reasons not attributable to counsel, the transcription of the proceedings on August 1 was substantially delayed, and when filed in the Circuit Court on November 4, 1991, counsel found there were transcription omissions and errors.

To supplement the transcript, counsel agreed to set forth in their respective memoranda, each filed in late November 1991, the relevant facts as they remembered them at trial and submit any dispute concerning the same to the court. This gracious procedure by counsel required no resolution of any dispute by the court.

In addition, the court has relied upon approximately 20 pages of handwritten notes it made during the proceedings on August 1, 1991, none of which are at relevant variance to the transcript or to the facts set forth in the memoranda of counsel.

The Individuals with Disabilities Education Act (formerly the Education of the Handicapped Act), 20 U.S.C. sect. 1400 *et seq.*, requires that a state, as a condition precedent to the receipt of federal funding for such educational purposes, enact legislation providing

handicapped children with a "free appropriate public education." In response, the Legislature enacted the Virginia special education statutes, Code §§ 22.1-213 to 22.1–221, and regulations were promulgated thereunder, Board of Education VR270–02–0007 ("VR").

The defining instrument for providing a free appropriate education is an "individual education program" ("IEP"). In *Martin v. School Board of Prince George County*, 3 Va. App. 197, 200, 348 S.E.2d 857, 859 (1986), the Court of Appeals stated:

> The IEP is a written document developed after a meeting between a handicapped child's parents, his teacher, and a qualified representative of the local school division. The IEP must contain specified information regarding the child, including the present levels of educational performance, annual goals, short-term instructional objectives, the specific educational services to be provided, and the extent to which such child will be able to participate in regular educational programs. The local school division must review the IEP at least annually and make appropriate revisions to the document. (Citations omitted). *See* § 22.1–215 and Board of Education, VR § 3.4B.

In addition, VR § 3.4A(3)(a) mandates that, to the "maximum extent appropriate . . ." handicapped children be placed in regular classes with children who are not handicapped or in special classes with other handicapped children, both in the public school system, a process generically known as "mainstreaming." If mainstreaming is not a viable placement, a placement in a state (or private) facility, known as a "residential placement," is appropriate.

Each school board shall make available a "continuum" of alternative placements. VR § 3.4A(2)(a). It is further required that such a placement must, *inter alia*, meet the "requirements for . . . [a] . . . least restrictive environment . . ." ("LRE"), VR § 3.4A(3)(c).

Nonetheless, a school board shall only consider a private placement when the program designed in a child's IEP "is not appropriately available . . ." in a public facility. VR § 3.4B(8)(b). In such circumstances, a private placement is warranted at public expense. § 22.1–218.

Susan Gill ("Susan") is a seventeen year old autistic who is mentally retarded. She functions as a two or three year old.

In September 1988, Susan was attending the autistic children's classes at Stafford High School. In October 1988, Susan's parents, for reasons they deemed sufficient, sought and obtained a home bound placement. They refused, however, an offer of the services of a homebound public school teacher.

A partial description of Susan's subsequent behavior was set forth in Plaintiff's Exhibit 1, an Evaluation of Education Programs, pages 1–2, received in evidence by this court on August 1, 1991 ("P. Ex. 1"):

> her parents reported that Susan had been taken out of her public school program the previous fall and that she was being cared for within their home. They reported that her maladaptive behavior had begun to escalate since Christmas and that she had gotten to the point where the Gills could no longer manage her. They reported that she had irregular sleeping patterns, engaged in nearly non-stop self-abuse or aggression to others, destroyed anything she could reach, and would not keep her clothing on. Her parents appeared thoroughly exhausted during the intake interview . . . .

As a consequence, on April 24, 1989, Susan's parents had her civilly committed "on an emergency basis"[1] to the DeJarnette Center ("DeJarnette"), a state residential facility in Staunton (T-116). The autistic program at DeJarnette was acceptable to Susan's parents as appropriate and in accord with her then IEP. (Plaintiff's Closing Statement Memorandum, p. 7, line 27).

In August, 1989, the autistic program at DeJarnette was administratively transferred to the Southeastern Virginia Training Center ("Southeastern"), a state residential facility in Chesapeake. An IEP was developed on September 18, 1989, recommending placement at Southeastern, and an opening was then available for Susan. This placement was held open for Susan for three months. Susan's parents, however, declined to accept this placement as appropriate, preferring a private residential placement at Grafton School in Winchester, Virginia, even though there was no opening at Grafton.

Susan therefore remained at home for "six to eight months . . ." (T-123), during which time her parents again refused proffered

---

[1] P. Ex. 1, p. 5, line 7.

homebound educational services, until her parents placed her at the private Cumberland Hospital ("Cumberland") (T-126), a "rehab facility for children . . ." (T-60), as described by an employee. There her maladaptive behavior was controlled by drugs (T-62–64, 68), and there she presently remains.[2]

By letter dated April 26, 1990, Susan's parents requested a due process hearing to resolve the dispute as to placement at Southeastern or Grafton, pursuant to the administrative appeal provisions of § 22.1–214(B) *et seq.*

A designated Hearing Officer took testimony over four days and considered approximately 200 exhibits, as well as memoranda of counsel. In his written decision of September 14, 1990, he concluded at pages 5–6:

> it is the determination of this Hearing Officer that the IEP developed September 18, 1989, by Stafford County Public Schools (SCPS) was reasonably calculated to enable Susan to receive educational benefit and that SEVTC (Southeastern) could properly implement that IEP.

Reacting to this decision, Susan's parents appealed to the next administrative level, that of a Reviewing Officer. Noting that there was (and remains) no opening at Grafton, while such a placement would be appropriate and preferable, his January 24, 1991, decision stated, as here relevant:

> that the local Hearing Officer's Decision to endorse the . . . proposed placement of Southeastern being the only available placement, and for that reason only, is upheld. (p. 7).

As directed by the administrative officer, a new IEP was developed for Susan, which recommended home-bound placement until an opening for placement at Southeastern became available.

Exercising the right of appeal set forth in Section 22.1–214(D),[3] Susan's parents filed the instant Bill of Complaint against the

---

[2] Susan's parents rejected the Board's suggested drug therapy to allow Susan to "mainstream" with other autistic children in the public schools in October 1988 (P. Ex. 1, p. 4, lines 13–15).

[3] Section 22.1–214(D) states: "Any party aggrieved by the findings and decision made . . . . may bring a civil action in the circuit court for the jurisdiction in which the school division is located. In any such action, the court shall receive the records of the administrative proceedings, shall hear additional evidence at

Stafford County School Board ("Board"). In the Bill, they allege in numbered paragraph 8 that "Southeastern could not provide . . . an appropriate education . . ." and in paragraphs 2 and 3 of their prayer for relief, request that the court find that Southeastern is not an appropriate placement and "require the Board . . . to place Susan . . . into Grafton as soon as space is available and pay for the cost of said program."

Among other stipulations, the parties agree, or do not dispute:

1. That the program at Dejarnette was appropriate. (Plaintiff's Closing Statement Memorandum, p. 7, line 27);

2. That at the time Susan left DeJarnette, there was a placement available at Southeastern but none available at Grafton;

3. That on August 1, 1991, the day of trial, there was no placement available at either Grafton or Southeastern;

4. That an appropriate placement for Susan is residential, that is, "mainstreaming" is not a viable alternative. (*See* Review Officer Decision, para. 2, p. 4);

5. That Grafton is an appropriate placement;

6. That proper procedures were followed in developing all of Susan's IEPs.

The standard of review in this cause was set forth by the Virginia Supreme Court in *School Board of Campbell County v. Beasley*, 238 Va. 44, 50-51, 380 S.E.2d 884, 888 (1989):

> the proper standard to be employed by the circuit court is "to determine, based on a preponderance of the evidence, whether the substance of the proposed individualized educational program is reasonably calculated to enable the child to receive educational benefits." *Beasley*, 6 Va. App. at 212, 367 S.E.2d at 741. *Accord, Rowley*, 458 U.S. at 206-07. But the provision that the circuit court base its decision on the preponderance of the evidence is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Due weight must be given by the trial court to the administrative proceedings. *Id.*

the request of the party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate."

*See also, Barnett v. Fairfax County School Board*, 927 F.2d 146 (4th Cir. 1991); *Tice v. Botetourt County School Board*, 908 F.2d 1200 (4th Cir. 1990); *Burke County Board of Education v. Denton*, 895 F.2d 973 (4th Cir. 1990).

This court must initially resolve a question concerning the burden of proof.

Do Susan's parents have to show that the substance of Susan's IEP *cannot* reasonably be calculated to offer her educational benefit with a placement at Southeastern? Or, must the Board prove the converse, that is, that her IEP *can* reasonably be calculated to offer her educational benefit with a Southeastern placement?

In *Beasley, supra*, 238 Va. at 51, 380 S.E.2d at 888, the Court said:

> As we scrutinize the trial court's decision and demonstrate that its judgment was not plainly wrong or without evidence to support it, we shall assume, *without deciding*, that the trial court properly ruled the burden of proof in inquiries concerning free appropriate public education lies with the school board. *Contra Bales v. Clarke*, 523 F. Supp. 1366 (E.D. Va. 1981) (burden of proof imposed on child's parents). (Emphasis supplied.)

This court notes in *Beasley*, unlike the instant cause, it was the School Board that invoked the jurisdiction of the Circuit Court by appealing from adverse decisions of the Hearing Officer and the Review Officer. By contrast, as noted above, Susan's parents appeal from adverse administrative decisions and, in the body and prayer of their pleadings, aver that a Southeastern placement is not appropriate. Recently, in *Barnett v. Fairfax County School Board*, 927 F.2d 146, 152 (4th Cir. 1991), the Court of Appeals stated:

> We reject plaintiff's argument that the district court incorrectly placed on them the burden of proof. In a previous case, we noted in a footnote that in an EHA action seeking to overturn a decision by a state hearing officer, the party challenging the hearing officer's decision properly bears the burden of proof in showing that the officer's decision was erroneous. *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, n. 2 (4th Cir. 1988), *cert. denied*, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 192 (1989). We see no reason to depart from our prior finding, and thus

we hold that the burden is properly allocated to the party challenging the administrative decision below. Because plaintiffs challenged the state hearing officer's decision in the district court, the court properly placed on them the burden of proof.

*See also, Hull v. Vance County Board of Education*, 774 F.2d 629, 636, n. 7 (4th Cir. 1985).

In light of the foregoing, this court concludes that the burden of proof lies with Susan's parents.

Plaintiff's primary witness, Laura Echols, basically reiterated that which she had written in her "Evaluation," which was received in evidence at the due process hearing on May 16, 1990, as Exhibit 118 in that proceeding and was received as Plaintiff's Exhibit 1 in this court on August 1, 1991.

Succinctly stated, then an employee at DeJarnette, she knew Susan at that facility from Susan's admission in April 1989, until August 1989, when Ms. Echols left to become an instructor in psychology at James Madison University.

Ms. Echols' only contact with Southeastern occurred during a three hour visit on March 6, 1990 (P. Ex. 1, p. 7, lines 10–11; T-37), after she had been hired as Plaintiff's expert witness. Her only contact with Grafton was a 4½ hour visit on March 9, 1990. (P. Ex. 1, p. 9, lines 7–8; T-14).[4]

Ms. Echols "felt that Grafton was a more appropriate setting . . . (because) . . . Southeastern is a . . . more restrictive setting." (T-8).

She further testified:

Q. It's your opinion that Grafton is more appropriate than Southeastern?

A. Yes, it is.

Q. You sent children to Southeastern?

A. Yes, I did.

Q. You agree that the program had some educational benefit to some children?

A. I agree.

---

[4] Ms. Echols' description of the programs offered at Grafton was primarily based upon representations of Grafton's staf as to their content, rather than upon her observation. (See P. Ex. 1, p. 9–10).

Q. I believe there's some guidelines set out, categories as to restrictiveness of certain placements. Isn't it true that both Grafton and the program at Southeastern both fall into category six of restrictiveness?

A. Of residential settings, I think you're right . . . (T-38).

THE COURT:

All right. Now, where is Susan now?

THE WITNESS:

She is at Cumberland Hospital.

THE COURT:

Is Cumberland less restrictive or more restrictive than Southeastern?

THE WITNESS:

In that it's a hospital setting, it would be considered more restrictive.

THE COURT:

Do you believe that her presence there is appropriate today at Cumberland?

THE WITNESS:

I would have to hear from her psychiatrist to make that determination. (T-49).

Finally, Ms. Echols testified:

Q. Are you claiming there was no educational program at Southeastern, while you were there?

A. No, I won't claim that. (T-44).

Plaintiff's next witness was Susan Shires, "a Special Ed teacher at Cumberland Hospital . . ." (T-60).

She testified:

Q. What kind of behaviors did you observe when Susan first came to Cumberland?

A. Those as well as disrobing, throwing things, screaming. One of the main reasons she was probably pulled out of my classroom was because of the noise that she could just — she couldn't tolerate being in that environment and she would scream and then she would start biting herself. Sometimes she would drop down on the floor and disrobe. I think that her behaviors had — I decided that she would no longer remain in the classroom where, when she was in the group, and drop her pants and defecated in the classroom.

Q. Why did she come to Cumberland?
A. For medication, to get these behaviors under control.
Q. Are they under control?
A. At this point they are, yes . . . (T-62-63).
Q. (Continuing) Do you believe that Grafton is appropriate?
A. Yes.
Q. Do you believe Southeastern is not appropriate?
THE COURT:
    She has no basis whatsoever, Mr. Wright, to make that comparison, does she?
Q. (By Mr. Wright) Do you have any basis to make that comparison?
A. None. No, I don't think so. (T-79).

The drug used at Cumberland for control is "called broncrytine. And it's a dopamine acting drug." (T-68).

Plaintiff's next witness was Patricia Denning Stiles, the administrator of the Adolescent Autistic Unit at Grafton, "who had met Susan two years ago . . . and [has] not seen [her] since . . ." (T-89).

As noted above, the parties have stipulated Grafton as an appropriate placement. Nonetheless, Ms. Stiles's relevant testimony may fairly be summarized as to show Grafton offers programs by which children with properly adaptive behavior are included in group residential homes, aid in housekeeping duties, and visit off-facility locations under staff supervision.

Ms. Stiles also testified, however, that when faced with maladaptive behavior specifically such as Susan's, "the very first thing you need to do . . . would [be] to remove this person from the program with this behavior." (T-93). This testimony, however, contradicts that upon which Ms. Echols relied in her written evaluation because, Ms. Echols wrote, "Ms. Fisher stated 'students were never restricted due to maladaptive behavior'." (P. Ex. 1, p. 10, lines 35-36). Finally, Ms. Stiles specifically denied that patients were ever given drugs effecting dopamine levels, (T-111-112), which have been given to Susan at Cumberland.

The testimony offered by the Board may be summarized as follows.

Lisa Yaryan, an employee of the State Board of Education, serves as a compliance and monitoring officer for special education programs whose "primary responsibility [is] with state operated pro-

grams." (T-139). She spent three days reviewing and observing at Southeastern and found the program there for autistic adolescents in compliance with all applicable federal and state laws and regulations, (T-143-146, 169), that is, Southeastern offers Susan a free appropriate public education. She was particularly "impressed" with the educational component of the autistic program and thought it could be "a state model . . ." as developed by Marsha Russo. (T-151).[5]

Marsha Russo testified that she is the assistant program manager for the autism program at Southeastern, holds a bachelors degree in education, mental retardation, and a masters in special education, and has nine years' experience in the field.

She testified that the autism program develops "self-help skills, communication skills" (T-197), permits the children to live in residential "cottages" (T-178), participate in housekeeping duties, after which "a group of four travel into the community for a community recreational activity" three times a month (T-188-190), requires a minimum staff/children ratio of ½, not including educators such as herself or psychologists (T-184), and promotes physical parental involvement at any time on or off the facility.

Ms. Russo testified that Ms. Echols spoke to her for "approximately 15 minutes" (T-188) on her visit to Southeastern. After reviewing Ms. Echols' Evaluation (P. Ex. 1), Ms. Russo stated the facts and conclusions therein stated concerning Southeastern were:

> simply not true, never has been true, because we have been providing those services and continue to do so on a daily basis.

In *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 73 L. Ed. 2d 690, 102 S. Ct. 3034 (1982), the United States Supreme Court posed and answered the opinion question as follows:

> What is meant by the Acts requirement of a free appropriate public education? (73 L. Ed. 2d at 699) . . . .
> Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized

---

[5] It is interesting to note that Ms. Yaryan's inspection was prompted by a complaint filed by counsel for Susan's parents.

instruction with sufficient support services to permit the child to benefit educationally from that instruction. (73 L. Ed. 2d at 710).

The Virginia Supreme Court in *Beasley, supra,* adopted this standard and in likewise quoting from *Rowley,* emphasized that a free appropriate public education does not require a "potential-maximizing education" but only one reasonably calculated "to confer *some* educational benefit upon the handicapped child." (Emphasis added.) *Beasley* at 49. As set forth above, this court has held that Susan's parents must show that Susan's IEP cannot reasonably be calculated to offer her educational benefit with a placement at Southeastern. After reviewing the voluminous record and considering the argument and memoranda of counsel, this court finds that they have failed to meet this burden.

Furthermore, even assuming that the Board had been required to show the converse, that is, that Susan's IEP can reasonably be calculated to offer her educational benefit at Southeastern, this court finds that that burden has been met and Southeastern offers Susan an appropriate free public education.

Counsel for Susan's parents further argues that as between the residential placement at Southeastern and the residential placement at Grafton, the latter is more appropriate because it offers a less restrictive environment in the continuum of placements.[6] Assuming, without deciding, that the requirement of an LRE does not merely demarcate the boundary between the class of residential placements and the class of non-residential placements, but rather requires gradation within each class of placement, this court finds the evidence is insufficient to show that Grafton is in fact a less restrictive environment than that at Southeastern. Moreover, as Susan's maladaptive behavior shows, especially if drug therapy is not utilized, it would be admittedly necessary "to remove . . . [Susan] . . . from the program . . . " at Grafton. (T-93).

In *Bales v. Clarke,* 523 F. Supp. 1366, 1370-1371 (E.D. Va. 1981), the United States District Court stated:

An appropriate education is not synonymous with the best possible education. *Springdale School District v. Grace,*

---

[6] Even though plaintiff's expert witness Ms. Echols testified that Southeastern and Grafton had the same LEA category. See above and T-38.

494 F. Supp. 266, 272 (W.D. Ark. 1980). It is also not an education which enables a child to achieve his full potential: "even the best public schools lack the resources to enable every child to achieve his full potential." *Rowley v. Board of Education*, 483 F. Supp. 528, 534 (S.D. N.Y. 1980). Plaintiff's parents are seeking an ideal education for their child.

Their aspirations are understandable, even admirable. But neither they nor any other parents have the right under the law to write a prescription for an ideal education for their child and to have the prescription filled at public expense. The law requires an appropriate free education. Efforts to build this requirement into something more will threaten the substantial gains already made in the education of the handicapped.

*See also, Colin K. v. Schmidt*, 536 F. Supp. 1375, 1386 (D. R.I. 1982), affirmed 715 F.2d 1 (1st Cir. 1983).

Judgment is entered in favor of the School Board of Stafford County.