NATRONA COUNTY SCHOOL
DISTRICT NO. 1, Petitioner,

v.

Arthur D. McKNIGHT and Carole Lee McKnight, parents and next friends of David McKnight, a minor; David McKnight; and The Wyoming State Department of Education, Respondents.

WYOMING STATE DEPARTMENT OF EDUCATION, Petitioner,

v.

Arthur D. McKNIGHT and Carole Lee McKnight, parents and next friends of David McKnight, a minor; and David McKnight, Respondents.

Nos. 88–75, 88–76.

Supreme Court of Wyoming.

Nov. 15, 1988.

---

Robert H. McCrary of Schwartz, Bon, McCrary & Walker, Casper, for petitioner Natrona County School Dist. No. 1 in No. 88–75.

Donald J. Sullivan of Sullivan and Zunker, Cheyenne, for respondents McKnight in Nos. 88–75 and 88–76.

Joseph B. Meyer, Atty. Gen. and Rowena L. Heckert, Sr. Asst. Atty. Gen., for respondent Wyoming State Dept. of Educ. in No. 88–75 and for petitioner in No. 88–76.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

URBIGKIT, Justice.

This appeal, third in sequence, considers the hearing officer determination that the local school district must provide compensatory education to a handicapped student for thirty-seven months beyond attained age of twenty-one years at an anticipated minimum cost of $113,208 per year, $9,434 per month or $310 per day for a total of $349,058 to be added to the previous tuition expenditure of $539,841, in addition to other amounts spent for the student's "regular" educational assistance by the Natrona County School District during his eleventh through twenty-first years. The child, born in 1966, was twenty-one on November 8, 1987 and has continued to receive the educational assistance and habilitation maintenance since that date, leaving about twenty-six months of compensatory education not yet provided for prospective costs in continuing controversy which will additionally total a cost to the state's educational system of not less than $245,284, plus the significant associated monitoring and supervisory expenses.

This court will follow *Natrona County School District No. 1 v. Ryan*, 764 P.2d 1019 (Wyo.1988) and *Wyoming State Board of Education v. Cochran*, 764 P.2d 1037 (Wyo.1988) in determining that entitlement to education ends at the twenty-first birthday, and reverse the bad faith decision of the hearing officer and award of compensatory education past the twenty-first birthday as a service that the Wyoming educational institutions lack constitutional and statutory authority to provide. *Monahan v. School Dist. No. 1 of Douglas County*, 229 Neb. 139, 425 N.W.2d 624 (1988). Nor are we unmindful in application of this case to the statutes and constitution of the State of Wyoming of what was said by the United States Supreme Court in *Brown v. Board of Education of*

*Topeka, Kansas,* 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (Brown II)—"School authorities have the primary responsibility for education * * *." Upon reflection of this axiom, we apply the educational standard without inappropriate favor or discrimination in assessing and providing education for the handicapped as equally required for the non-discriminatory education for the unimpaired. *Levine v. State Dept. of Institutions and Agencies,* 84 N.J. 234, 418 A.2d 229 (1980).

Within this complex of mixed issues of fact and law is the requirement to reconcile satisfactorily the "need for a free appropriate public education [for the student] with the need for the State to allocate scarce funds among as many handicapped children as possible," while at the same time maintaining the constitutional responsibility for a proper education for the 90% of the students who are not handicapped and the 89% of the handicapped students who are actually educable within their achievable capacity to become fully self-sustaining and participating adults. *Age v. Bullitt County Public Schools,* 673 F.2d 141, 145 (6th Cir. 1982).[1] Our standard of philosophical review is the issue of appropriateness as addressed in majority opinion by now Chief Justice Rehnquist in *Board of Educ. of Hendrick Hudson Central School Dist. Bd. of Ed., Westchester County v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). We will also recognize in historical perspective the constitutional, ethical and proportionality issues which presented the endowment for congressional passage of the 1975 Education for All Handicapped Children Act (EHA). Comment, *The Handicapped Child Has a Right to an Appropriate Education,* 55 Neb.L.Rev. 637 (1976); Comment, *Toward a Legal Theory*

*of the Right to Education of the Mentally Retarded,* 34 Ohio St.L.J. 554 (1973).

## I. ISSUES

Issues enunciated for appeal by petitioner, Natrona County School District No. 1 (School District), include as dispositive subjects[2] the contentions that the hearing officer erred:

[I]n granting DM compensatory education beyond the age of twenty-one (21) years because no child in Wyoming can be educated at public expense beyond the age of twenty-one (21).

[I]n determining that the prior administrative hearing regarding an appropriate educational placement and discussing the issues of due process violations, which was not appealed from by any party, did not create an estoppel nor was the same res judicata with respect to the present request for hearing involving educational deprivation, the claim for which arose out of the same issues determined in the prior administrative hearing.

Respondents, Arthur and Carole McKnight, father and stepmother (parents), of the involved child (DM), differently phrase these subjects as whether:

[I]n an appellate review of an agency hearing determination in which Petitioners offer no showing of lack of substantial evidence supporting the findings of fact about which they appeal, any consideration should or may be given to any other matter asserted by Petitioners.

[A] party who successfully urges a rule of law upon a tribunal, so that it becomes the law of the case, may subsequently appeal from the application of the very rule of law which it had urged.

Creating a collateral issue, the State Department of Education (State Board) ap-

---

**1.** Something more than 10% of all children fall within the generic classification of handicapped as addressed by the United States Congress in the Education for All Handicapped Children Act, 20 U.S.C. §§ 1400, et seq. (1982 ed. & Supp. IV 1986) (EHA). It was considered by the 1970 census that mildly handicapped children encompassed about 89% of the handicapped student population. Moderately handicapped, which still fell within the educable category, were 6%. Severe and profoundly severe, within which

group this handicapped student (DM) is educationally included, totalled 5%, as a category with an IQ of thirty-five or below.

**2.** Serious and substantial issues as briefed and argued of undisclosed bias of the hearing officer and statute of limitations will only be noted by reference in opinion text and not otherwise considered for this decision.

peared both as a captioned party and by appellate brief after filing a separate petition for review as now combined in this appeal. At issue was whether the Department or Board was a proper litigant or even properly before the hearing officer because of the parents' contention of pleading default. Our present disposition will not require any separate controversy resolution between state educational agencies and DM. Initial litigants are the School District and DM who properly and adequately present the issues to be decided. The relationships between the Wyoming state educational agencies and the controlling features of state constitution and statute as related to the federal statutes were comprehensively considered in *Ryan*, 764 P.2d at 1027 and will not be further discussed. *Compensatory education after the termination of the statutory age eligibility period is this case for present appeal.*

## II. FACTS

Extended review of this educational effort of the School District will be addressed, since the present compensatory education claim relates to contended denial of the required free appropriate public education in a confined period between 1979 and 1982 of thirty-seven months. At age twenty-one, DM was considered by expert testimony to have attained something less than a chronological two year old academic development as the result of fifteen years of education and habilitation efforts of the School District. The problems of this young man are sufficiently severe so that different experts did not even agree on a diagnosis of autism, mental retardation or a combination of both.

DM moved to Casper with his family in 1973 at the age of seven. He was placed in the A.J. Woods school as specially structured by the School District to be a high effort, heavily staffed facility for educable or trainable handicapped children, including both educable mentally retarded and trainable mentally retarded students, although primarily the latter, within the Casper school system's 13,000 students. The Woods school in Casper like Miller in Cheyenne was in the forefront of handicapped education for Wyoming public education as an advanced educational system which, commencing in the mid–1960's, undertook responsibility for trainable as well as educable students with either or both physical and mental impairment.

Despite all staff efforts within the special education environment at Woods, with apparent instigation of the parents, by 1977, factors of low attainment, advancing chronological age, and severity of problems induced the School District to place the child, then ten years old, in the Behavior Research Institute in Providence, Rhode Island (BRI), a high tuition private handicapped facility. About two years later with concern about cost, distance, and ultimate post-education transition, DM was moved from BRI and enrolled for maintenance-educational assistance in the Devereux Foundation, another private institution located in Scottsdale, Arizona.

It is out of this move from BRI to the Devereux Foundation that principal controversy has subsequently been generated through two separate administrative hearings, one in 1981 and this present proceeding now on appeal. After eighteen months, the Devereux Foundation, by maximum age limitation and disinclination to retain DM because of his condition, denied continued care. In November 1980, DM was returned to Casper for anticipated re-entry into Woods. This change was not acceptable to the parents who contended that residential placement was required. Evaluation for care, maintenance and education by the Wyoming State Training School, a state institution for handicapped, was made at the request of the School District resulting in the facility's conclusion that it was not organized to provide adequate education for an individual of the status of DM. From a course of disagreements between the parents and the School District regarding standard of care, including desired domiciliary arrangements, a hearing was convened by parental request in 1981.[3]

3. Chronology of educational history and School District expenditures:

The hearing officer found generally for the parents and DM, in determining that the School District sponsored special school was not an appropriate placement to meet DM's educational needs to provide the

1973—Family moved to Casper and seven year old DM was placed in A.J. Woods—the School District's special education school.

1977—DM admitted to BRI.

4/1/79—DM removed from BRI and taken by his father to Scottsdale, Arizona, where he was enrolled in the Devereux Foundation on about April 2, 1979.

10/20/80—DM dismissed by Devereux, picked up by his father and returned to Casper.

11/7/80—Transferred for attendance to A.J. Woods but apparently did not attend because of disputes between parents and School District.

1/6/81—Child Study Committee (CSC) meeting for local school education, parents appeared and represented by counsel.

2/17/81—Another CSC meeting, parents appeared and represented by counsel.

3/5/81—Individualized Educational Program (IEP) approved by School District and rejected by parents, who appeared and were represented by counsel.

3/6/81—Hearing requested.

8/10–12/81—Hearing held.

9/2/81—DM was moved from home to Wyoming State Training School for respite care for the parents and did not return to Casper when school started.

9/11/81—Decision rendered by Dr. Willard G. Jones, hearing officer, Greeley, Colorado.

9/20/81—School board with parents and counsel in attendance voted to place DM in Valley of the Sun, a facility in and licensed by the State of Arizona. Thereafter, parents rejected that placement.

Late 1981—From hearing officer recommendation, the School District hired Dr. Allen Huang for a placement recommendation. Three school board meetings were held in January, February and March when placement status was discussed.

3/15/82—Dr. Huang reported to the board and parents in recommending return to BRI, which the board approved.

5/82—DM returned to BRI after criteria for care enunciated by Dr. Huang was accepted by the institution so that reduced aversions would be utilized in the application of the IEP. Thereafter, BRI conceded to conditions and a contract was signed for admission to be accomplished on May 10, 1982.

11/18/85—In confining letter by the School District to the father in addressing transitioning, it was stated by a School District authority:

I am surprised to see that you have forgotten about the conversation I had with you at the Ramada Inn (Downtowner) last February. I went there to collect a Consultant who was doing some workshops for the district (Febru-

needed twenty-four hour supervision and educational services. Neither party appealed for judicial review.

The IHO with this decision is not recommending placement in any particular

ary 28 & March 1). Anyway I saw you there and approached you to ask you if you were beginning to plan for David given that he will reach 21 fairly soon (i.e. funding will cease). I also mentioned that I had recently been in Denver and was encouraged by the service model they have there for autistic children. I suggested that we need to plan for a transition, i.e., something between B.R.I. and adult services.

1987—Parents were again advised that age twenty-one as forthcoming would end School District funding eligibility.

10/27/87 & 11/3/87—Hearing was requested by parents. As the result of the requested hearing, DM has since remained in BRI.

12/14–16/87—Hearing held.

12/31/87—Decision entered by the hearing officer.

1/15/88—Petitions for review filed by School District.

2/12/88—Petition for review filed by the State Department of Education.

3/23/88—Case docketed by the Wyoming Supreme Court.

9/14/88—After briefing was completed, oral argument was held.

In analysis of incurred costs, tuition costs at BRI in 1977 were $2,638 a month and in October 1987, $9,434. These are pure tuition costs and do not include supervision, monitoring, parent and staff travel and other expenses.

Tuition totals:

| | | |
|---|---|---|
| BRI Feb. 1977—March 1979 | 20 months | $ 56,461 |
| DEV April 1979—November 1980 | 19 months | $ 44,875 |
| BRI April 1982—October 1987 | 67 months | $438,505 |
| BRI October 1987—September 1988 | 12 months | $113,208 |
| Total through September, 1988 | | $653,049 |

The current *monthly* cost of $9,434 compares with the 1986–87 School District 401 Report: 1,392 handicapped students (without BD students) total $6,612,073.50, average $4,750.05 *per year*.

1,460 students (with BD students) $6,612,073.50, average $4,528.82 *per year*.

In all cases, these amounts reflect the costs for providing educational services only. It does not include related service costs which, for a facility in Rhode Island, are singularly greater. Total costs for all facets of expense to the School District including staff time, travel, litigative costs and expert fees probably now approach a million dollars and will certainly exceed that cost if an additional tuition for twenty-six months is provided.

facility but rather admonishing the district to locate suitable placement. Said placement should provide for twenty-four hour, year around program designed to meet D's needs which are not confined to a school day but rather are pervasive. The programs provided by such a facility are professionally described as "precision teaching" and require consistent implementation not only during instruction periods but during D's waking hours. Since D in the past has been managed without the use of drugs, a facility in which only scrupulously, prudent use of this form of "therapy" should be considered. Further, since the use of aversive reinforcers or punishment, although appropriate under certain circumstances, is often questioned in the management of children like D, the district should chose a facility for placement which has clear ethical procedures for approval of the use thereof and maintains appropriate communication to district personnel and the parents of the intent to use and nature of said techniques.

It is apparent from the report of the hearing officer that education, training, maintenance, and parental respite were intermixed in concern to be addressed in the placement.

To meet the decision requirements, and find an area of agreement with the parents, the School District hired an independent specialist, Dr. Allen Huang of Greeley, Colorado, for placement direction. Dr. Huang first considered placement in another Arizona institution called the Valley of the Sun which, with several other facilities, was visited. Finally, finding nothing that was acceptable to the family, he recommended re-enrollment in BRI, where DM has remained.

BRI is a well-publicized non-profit corporation devoted to the development of behavioral technology. The facility combines residential units in Massachusetts and adjacent educational facilities in Rhode Island. The usual type of person accepted for placement involves severe behavioral problems. The regimen for control and instruction involves extensive use of negative aversives as well as affirmative food rewards as a very structured process. It was in the use of physical aversives that controversy developed; as for example, the delayed re-enrollment of DM in the institution in 1982 resulted from differences between Dr. Huang and BRI about limitations on use of certain aversive procedures for DM.

As evidenced in the record through one of DM's individualized educational programs, the aversives included were:

The aversives which may be used are to be administered in a hierarchical fashion so as to ensure that at all times the student is receiving the least restrictive procedure that is effective in dealing with the behavior or treatment problem in question. Aversives for inappropriate behaviors are always to be used in paired combination with rewards for the opposite, desired behaviors. Aversives are to be employed within various constraints established by, among others, licensing and funding authorities, BRI's Human Rights and Peer Review Committees, and the Institute's own policies and procedures. Consultation from medical and psychiatric experts shall be used, when required, and the students are regularly examined by a nurse and by BRI staff with respect to the effects of aversives. Decisions concerning employment of, and change of, aversives are governed by data taken daily.

The aversives which may be used singly, in specified multiples, or in combination, and within the foregoing restraints and safeguards, include the following (which are not necessarily listed in the particular hierarchical order in which they might be used in a particular case): ignoring, no, token fine, water spray, vapor spray, vision-occluding, and sound-masking helmet, ammonia, taste aversive, cool shower, muscle squeeze, spank, pinch, time-out helmet with safety tube and optional automatic vapor spray, contingent physical exercise, and hand squeeze. It is understood that the number to be used cannot be limited in advance because it depends largely upon the number of times the inappropriate behavior occurs. Permission forms describing these procedures in detail are to be signed by the parents and renewed periodically.

The requirement for placement by Dr. Huang included:

> After carefully reviewing your letter, the data you sent to me, and the materials in my office, I feel that my recommendation for [DM] to attend BRI or any other agency with the condition to exclude a "cold shower" and a "time-out with physical restraint in the barrel" from his treatment program should not be changed. It is not my intent to debate "the issue" related to aversive treatment at this time. I recognize, however, that some aversive procedures in conjunction with positive reinforcement may be needed to assist [DM's] total growth including social, psychological, and physical. Based upon the findings from my review, research, and observation, I have recommended your program with the best interests of [DM] in mind. I do believe that you and your staff could use many alternative techniques to work with [DM] and accomplish the objectives set for him.[4]

4. The controversial nature of the BRI process as involving a hierarchy of negative physical aversives as also combined with use (or contended misuse) of food contingencies is found in the order to show cause document issued by the State of Massachusetts, which recites:

> 24. During the OFC [Massachusetts Office for Children] licensing study of September 1984 through April 1985, OFC learned that BRI was using the following hierarchy of aversives.
> (1) Ignore
> (2) Firm "no"
> (3) Token Fines
> (4) Water Squirt to the face or back of neck
> (5)(a) Vapor Spray I to the face or back of neck (compressed air mixed with water vapor lasting approximately three seconds)
> (b) Air Spray (same as Vapor Spray I without the water)
> (6)(a) White Noise Visual Screen (a football helmet with an opaque screen to occlude vision and a masking or other unpleasant repetitive noise.)
> (b) Taste Aversive (vinegar, vanilla extract, lemon juice, jalepeno pepper spray, or other taste aversives applied to lip or tongue)
> (c) Standing time-out in White Noise Visual Screen (standing in bare feet on an uncomfortable rubber floor mat)
> (d) Ammonia (ammonia fumes sprayed near nose)

In considerable detail, the entire hearing record demonstrates professional differences in acceptance of the BRI system, both as a matter of philosophy regarding corporal punishment and retained permanency of achieved behavioral modification after discontinuance. The latter concern is reflected in asserted refusal of some institutions to accept students who have previously attended BRI. More substantive in the unresolved inquiry is the retentive factor in adulthood of the "prompt proneness" in the system as a character retention factor upon the individual's movement to a less structured environment, such as a sheltered workshop; in short, does the rigidly controlled and augmented system lapse for behavioral control when discontinued.

As clearly established by this record, BRI accomplished a life skill improvement of real credibility and a decreased destructive character of behavior for DM which had not been achieved by any other education or training system or institution.

> (e) Vapor Spray II (lasting approximately 15 seconds)
> (f) Vapor Spray III (lasting approximately two minutes)
> (g) Contingent Physical Exercise (series of sit-ups or toe-touches)
> (h) Remove Vapor Spray (vapor spray attached to the White Noise Visual Screen)
> (i) Social Punisher (student loosely tied to another student he/she finds aversive)
> (7)(a) Hand Squeeze
> (b) Wrist Squeeze
> (8) Rubber Band (Snapped on wrist or inner arm)
> (9) Spank (applied to bare buttocks or thigh)
> (10) Muscle Squeeze (applied to shoulder, triceps, pectoral, or thigh)
> (11) Rolling Pinch (applied to buttocks, inner arm, inner thigh, bottom of feet, palms of hands, or stomach)
> (12) Finger Pinch (applied to buttocks, inner arm, inner thigh, bottom of feet, palms of hands, or stomach)
> (13) Water Spray III (bucket of cold water poured over head)
> (14) Brief Cool Shower (one minute shower at approximately 50 degrees)
> (15) Automatic Vapor Spray Station (AVS) (wrists and ankles restrained while child wears Remote Vapor Spray Helmet; usually implemented in conjunction with other aversives)
> (b) Multiple Consequences

The unresolved doubt within the education fraternity was the application of the improvement to transition him to other environments, and whether near maximum results from that environment had been achieved first in 1979 or later by 1985–1986 so that the program thereafter was essentially maintenance and minimally directed education or training. Unquestionably, actual attainment age of approximately two years did not change for a period of eight to ten years of chronological time for the individual. Consequently, the philosophic subject of scope of responsibility of public education for twenty-four hour maintenance and habilitation [5] was directly presented.

In 1987, the School District was officially advised by the State Department of Education, that the State would not fund post-twenty-first birthday continued education for any handicapped student. The parents of DM were advised of the School District discontinuance of educational service which provided the domiciliary care at BRI. Another hearing was then requested by the parents under the procedures of federal statutes and state rules to contest this placement change. With a new hearing officer named by the State Superintendent of Public Instruction, primary issues developed were eligibility for additional education for the year past twenty-first birthday and compensatory education for the period between 1979 and 1982 when DM was not in BRI.[6]

The hearing officer made three broad decisions; two legal and one factual. In legal decision, he determined, as had the hearing officer in *Cochran*, 764 P.2d 1037 (Wyo.1988), that public educational eligibility in Wyoming ended at the twenty-first birthday. With this conclusion, we concur as established by our decisions in *Ryan*, 764 P.2d 1019 (Wyo.1988) and implicit in *Cochran*, 764 P.2d 1037 (Wyo.1988). A second legal conclusion was then made by him in contradiction of the first decision, that he could require compensatory education beyond age twenty-one if, in his analysis, any period of adequate free appropriate public education had been denied during any time of the School District's responsibility of 1973 through DM's twenty-first birthday in 1987.

The third decision by the hearing officer was factual in determination that the School District acted in bad faith both substantively and procedurally in interruption of placement at BRI in 1979 as considered in the 1981 hearing. As a result of the factual decision and in accord with the second legal conclusion, he ordered thirty-seven months of post-twenty-one age compensatory education to apparently be provided in BRI.

In application of both federal and state law, we separately consider these three substantive topics after first resolving the standard for review to be applied by this court.

## III. STANDARD FOR REVIEW BY THIS COURT

In Ryan, we casually considered the standard of review by the judicial tribunal to

---

(c) Combined Aversives.

5. Defined as education and training for those, such as the mentally retarded, who are not ill. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 7 n. 2, 101 S.Ct. 1531, 1535 n. 2, 67 L.Ed.2d 694 (1981).

6. The one fact not in controversy in this extended evidentiary proceeding was that DM had not substantially gained in general academic attainment age, to be differentiated from living skills, during the period between his fifteenth and twenty-first years. In 1980, in conjunction with habilitation at the Devereux Foundation, an independent agency, Behavior Evaluation Specialist Teams, Inc., conducted an evaluation. Then thirteen years and 5 months of age, the report reflected:

*Intellectual Assessment* reveals that [DM] is currently functioning in the profound range of mental retardation, however these results should be considered minimal estimates of his true capabilities. [Emphasis in original.]
*Adaptive Behavior Assessment* reveals that [DM] is functioning at approximately a 5 year old level. [Emphasis in original.]
In a report of September, 1985, furnished by BRI, the levels found were one year and five months for communication domain; three years and one month for daily living skills domain; zero years and eleven months for socialization domain; and one year and eight months for adaptive behavior composite. The most recent reports in this record show chronological attainment age of between one year and seven months to two years of age.

consider a petition for review from an administrative agency decision. This case in present juncture is somewhat novel for a number of reasons, including initially the uncustomary process provided in Wyoming law of the direct certification from district court to the Supreme Court when a petition for review is presented by an administrative agency under the purview of W.R.A.P. 12.09.[7] Consequently, for present disposition, the decision of this court apprehends unusual characteristics of fact finding and appellate adjudication. Additionally, we are not presented with a typically reviewed decision from an administrative agency. The hearing officer in this case was not professionally trained in educational matters, since designated by application and status as a practicing attorney. His evidentiary decision was not evaluated by the professional agency implicit in the normal administrative proceedings. This would normally put the trial court, and in certification situation, this court in the express posture of re-analyzing the basic evidence used for decision since the technical expertise is not a factor presented. Additionally, we are presented with the peculiarities of the federal statutes which provide concurrent jurisdiction to either the federal or state courts and specifically apply a standard of review which is different from the normal process of federal administrative law or this state. Title 20 U.S.C. § 1415(e)(2) (1982 ed. & Supp. IV 1986) states:

Any party aggrieved by the findings and decision made under subsection (b) [hearing process in local or state venue] who does not have the right to an appeal under subsection (c) of this section, [review of local decision by state superintending authority] and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. *In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.* [Emphasis added.]

This standard of review is simply not compatible with Wyoming administrative review standards of W.R.A.P. 12.09 and W.S. 16-3-114(c), which are comparable to present standards of the federal courts and most states.

A fairly detailed consideration of the extensive number of EHA cases demonstrated that the normal administrative review standard is not preclusive. *Beasley v.*

---

7. The basis of direct certification is found in the second paragraph of W.R.A.P. 12.09, providing:

If after such review, the district court concludes the matter to be appropriate for determination by the Supreme Court, the district court may certify the case to the Supreme Court. Upon notification of such certification, the petitioner shall pay the required docketing fee.

* * * If the matter is not certified to the Supreme Court, the district court shall enter judgment, affirming, modifying, or reversing the order of the agency.

Ordinarily, we would remand and require findings of fact by the certifying trial court by virtue of the particularized nature of these proceedings as presented pursuant to the terms of the federal statute. In this case, the extreme cost status as currently accruing and indeterminate status of the appropriate standard of review forecloses that more leisurely disposition.

However, by virtue of the cases involving EHA and correlative state rules, no further direct certifications of these cases will be accepted. The district courts should consider that the provisions of W.R.A.P. 12.09 are subject to this interpretation. Although it was not attempted in this case, the requirement of 20 U.S.C. § 1415(e) (1982 ed. & Supp. IV 1986) of the federal statute, that additional evidence can be introduced, is preclusive of direct certification. Additionally, as adduced in this particular case, with the extreme volume of exhibit material actually presented and without a record determining clearly what the hearing officer actually considered, see footnote 13, infra, first consideration and review by the district court is not only appropriate but also required as similar to *Cochran*, 764 P.2d 1037 (Wyo.1988), where the forum was declaratory judgment rather than petition for review and the case was remanded for initial decision by the district court.

*School Bd. of Campbell County,* 6 Va. App. 206, 367 S.E.2d 738 (1988). Although this result is largely derived from the text of the federal statute itself as considered in general terms by the United States Supreme Court in *Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690, (1982) there has developed a fairly specified set of special EHA review rules as similar in both state and federal courts.

First applied is the concept that the review analysis when considering the hearing officer's decision encompasses mixed questions of law and fact with the effective fact finding function finitely transferred to the judiciary by 20 U.S.C. § 1415(e)(2) (1982 ed. & Supp. IV 1986). *Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690; *Doe v. Anrig,* 692 F.2d 800 (1982), overruled on other grounds, 722 F.2d 910 (1st Cir.1983). The decisional process requires that "a dis-trict court must make an independent determination based on a preponderance of the evidence, *giving due weight to the state administrative proceedings." Geis v. Board of Educ. of Parsippany–Troy Hills, Morris County,* 774 F.2d 575, 583 (3rd Cir.1985) (emphasis added). In *Geis,* the appellate court perceived that "the district court did exactly that, specifically citing the evidence in its record and the administrative record that supported its conclusion, as well as discussing the conflicting evidence." Id. at 583. See *Board of Trustees of Pascagoula Mun. Separate School Dist. v. Doe,* 508 So.2d 1081 (Miss. 1987). See also *David D. v. Dartmouth School Committee,* 775 F.2d 411 (1st Cir. 1985), cert. denied 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986) and *Roncker on Behalf of Roncker v. Walter,* 700 F.2d 1058 (6th Cir.), cert. denied 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).[8]

---

**8.** The peculiarity of this case at this juncture is recognized in that the large majority of all litigation is derived from the federal courts which diagnose the initial state administrative agency proceedings. As a state appellate court, we are responsible for the final establishment of state law and do not have the deference responsibility largely referenced by the federal courts in these proceedings. Furthermore, we do not have a decision of either a fact finding court or an administrative agency, since the decision presented was unreviewed following hearing officer conclusion.

The evidentiary status is further complicated since one of the two principal witnesses for DM had previously served as an attorney for DM and his parents and the second was an officer in BRI whose monetary interest was recognized in the annual maintenance fee last billed at $113,-208 per year. Consequently, this court approaches the review by a comprehensive consideration of the record. Witnesses at the extended hearing as called by DM included in addition to his parents, a representative of the School District, the prior attorney now appearing as professional expert witness and a representative of the domiciliary facility. Witnesses provided by the School District were two employees. Within the nature of the way the hearing was presented, the State Superintendent of Public Instruction's office did not directly participate nor provide witnesses, except that the Deputy Superintendent of Public Instruction was called as an adverse witness in regard to the issue now resolved by our prior case of the age twenty-one/age twenty-two eligibility.

Consequently, a resolution of most of the facts and factual issues as addressing either the circumstances involved in the prior hearing, confined to a record of that hearing with the transcript not presented and the documentary evidence there considered, or to the more current documentary evidence representing IEP and progress status. This leaves this court to make a detailed review and analysis of a very extended documentary case reflecting innumerable hours of professional activities of the educators as diagnostic, habilitation and educational in character, expertise and activity.

This court does find itself in the position reflected by the Florida Court of Appeals in *Hendry County School Bd. v. Kujawski,* 498 So. 2d 566, 568 (Fla.App.1986):

Basically, Florida's plan mirrors the Federal EAHCA. The Florida plan, however, does have one very significant and unfortunate difference. The federal system provides for de novo review in a state court of competent jurisdiction or in a United States District Court. 20 U.S.C. § 1415(e)(2). The review in those courts is de novo. *Roncker [v. Walter,* 700 F.2d 1058 (6th Cir.1983) ]. The Florida system provides for review by the district courts of appeal. § 230.23(4)(m)(4), Fla.Stat. (1985). The district court of appeal is an appellate court and is, thus, ill-equipped to provide de novo review of a hearing officer's actions. We reluctantly accepted review of this case.

The extensive literature provides little concrete direction as how to meet and verify the immediate needs of DM as far removed from conventional educational assistance, to properly consider anguished and intense interests of the parents, find funds for the required activity and leave school district and state finances sufficiently solvent to perform its constitutional de-

■ The appellate consideration standard (as in the future to be first applied in this state by the district court) is that review is conducted de novo with issues presented encompassing mixed questions of fact and law, *Wexler v. Westfield Bd. of Educ.*, 784 F.2d 176 (3rd Cir.), cert. denied 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986), from which an independent determination will be made by a preponderance of the evidence with due deference given to professional expertise and decisional appropriateness as documented by the administrative hearing. The burden of proving that the hearing officer erred is on the appealing party. *Pascagoula*, 508 So.2d 1081.

The difficulty in decision is noted as an example in discussion of *Martin v. School Bd. of Prince George County*, 3 Va.App. 197, 348 S.E.2d 857, 864 (1986):

> As the circuit court suggested, the School Board is not responsible primarily for treatment of David's emotional disability. Nevertheless, the School Board was required to offer a residential placement in which David would receive both educational instruction and intensive professional attention for his learning disability, if a free appropriate public education could not be provided by a less restrictive placement. This determination is not a simple task for the professional educators who were directly involved in preparing an IEP for David.
>
> It is no less difficult for a court presented with the issue of residential placement to separate medical, social and educational problems.

Since we establish a preponderance test for the district court and a plainly wrong test for appellate review, the arbitrary and capricious and not supported by substantial evidence standard normally employed for administrative agency review is inapposite.

Furthermore, as an appellate tribunal, we will not ignore precedent of the United States Supreme Court decisions in application of federalism principles which are determinative on matters of constitutional application through legislation of the United States Congress. *Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690, affords us no pause since we had previously held that a Wyoming standard is constitutionally emplaced for equal education and is, at least if not more, demanding than criteria resulting from the EHA. *Ryan*, 764 P.2d 1019 (Wyo.1988). The substantive thesis remaining is whether *School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) supersedes Wyoming's statutes and constitution in requiring an ongoing educational expenditure for thirty-seven months for a person not otherwise eligible as a replacement for claimed ineffective educational assistance some six to eight years earlier. Cf. *Honig v. Doe*, —— U.S. ——, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

## IV. TERMINATION OF EDUCATIONAL ELIGIBILITY AT AGE TWENTY-ONE

This subject is settled by this court's decision in *Ryan*, 764 P.2d 1019 (Wyo. 1988). School District conduct and funding of post-twenty-first birthday education can

signed functions of public education in a time of attack and criticism. See Broadwell and Walden, *"Free Appropriate Public Education" After Rowley: An Analysis of Recent Court Decisions*, 17 J.L. & Educ. 35 (1988); Cichon, *Educability and Education: Filling the Cracks in Service Provision Responsibility Under the Education for All Handicapped Children Act of 1975*, 48 Ohio St.L.J. 1089 (1987); Rothstein, *Right to Education for the Handicapped in West Virginia*, 85 W.Va.L.Rev. 187 (1983); Krass, *The Right to Public Education for Handicapped Children: A Primer for the New Advocate*, 1976 U.Ill.L.F. 1016 (1976); Comment, *The Education for All Handicapped Children Act: The Benefits and Burdens of Mainstreaming Capable Handicapped Children in a Regular Classroom*, 38 Mercer L.Rev. 903 (1987); Comment, supra, 34 Ohio St.L.J. 554; Note, *The Meaning of Appropriate Education to Handicapped Children Under the EHCA: The Impact of Rowley*, 14 Sw.U.L.Rev. 521 (1984); Note, *Enforcing the Right to an "Appropriate" Education: The Education For All Handicapped Children Act of 1975*, 92 Harv.L. Rev. 1103 (1979); Note, *The Education of All Handicapped Children Act of 1975*, 10 U.Mich.J. L.Ref. 110 (1976); and Note, *The Education for All Handicapped Children Act: Opening the Schoolhouse Door*, 6 N.Y.U.Rev.L. & Soc.Change 43 (1976).

be undertaken by neither the School District nor the state educational agencies as a public educational responsibility under present statutes or constitutional criteria. We have clearly defined and delineated the public educational function by age limitation as may be differentiated from higher education, vocational rehabilitation, maintenance, or medical care responsibility for the individual which would come within social services or other governmental agency responsibility. Neither the judiciary can nor the legislature has expanded public education past the intrinsic responsibility in age for what was adopted in the state constitution. The present finite limitation of public education ends with the twenty-first birthday. *Adams Central School Dist. No. 090, Adams County v. Deist,* 214 Neb. 307, 334 N.W.2d 775, opinion supplemented by 215 Neb. 284, 338 N.W.2d 591 (Neb.), cert. denied 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983). Cf. *Helms v. Independent School Dist. No. 3 of Broken Arrow, Tulsa County, Okl.,* 750 F.2d 820 (10th Cir.1984), cert. denied 471 U.S. 1018, 105 S.Ct. 2024, 85 L.Ed.2d 305 (1985), required equivalent years of educational opportunity.

### V. POST–TWENTY–ONE COMPENSATORY EDUCATION WHEN SUFFICIENCY OF THE PRIOR EDUCATION IS CONTESTED

■ Intrinsic to the decision that educational responsibilities end at age twenty-one is the correlative inquiry whether, despite statute and constitution, continued eligibility can be obtained as compensatory to pre-age twenty-one challenged level of attainment. This is generically designated as the right to post-period compensatory education. As essentially resolved by Ryan, it is our conclusion that the State Board of Education lacked authority by statute or constitution which would *authorize acceptance* by negotiation for a residual liability against the School District to require it to violate statute and to extend the constitution in order to provide for educational services past age twenty-one. We recognize the stated argument that the federal statutory system could include a condition

precedent for benefits which might invoke a compensatory contingent post-age twenty-one obligation. However, we find that no authority now exists for Wyoming to enter into this contractual requirement or any as might evolve from the federal programs by either implied agreement or adopted regulation. The hearing officer, likewise, as Monahan and Deist would teach, had no authority to order compensatory education, since the School District has no authority to provide the service.

We are also concerned since if Wyoming, by policy, embarks upon theories of educational malpractice, which buttress claims for compensatory educational services, that it, under equal protection and due process, can properly confine relief to a subcategory of the handicapped. The system, consequently, would be faced with failed expectation complaints applicable to all "graduating" students or at least for those students who do not become Rhodes Scholars. This court is not presently willing to embrace a general theory of educational malpractice which would serve as a foundational premise from which compensatory education for those who have not reached desired limits of achievement by age twenty-one might opportunistically continue in the public educational system, and particularly so, if the predicate functions of special training or habilitation might be added. Comment, *Educational Malpractice— Does the Cause of Action Exist?,* 49 Mont. L.Rev. 140 (1988); Comment, *Education Malpractice: A Cause of Action that Failed to Pass the Test,* 90 W.Va.L.Rev. 499 (1987); Note, *Educational Malpractice: A Cause of Action in Need of a Call for Action,* 22 Val.U.L.Rev. 427 (1988).

Premised on constitutional definition and defined by statutory limitations, we will not extend educational responsibility by whatever theory beyond age twenty-one at least in the absence of peculiar circumstances that are not considered here as factually established whether characterized as egregious and unremitted bad faith or otherwise. Cf. Comment, *Compensatory Educational Services and the Education For All Handicapped Children Act,* 1984 Wis.

L.Rev. 1469 (1984). Normalized public education in Wyoming ends about age eighteen or nineteen and the additional two years generally available as compensatory to the underachiever or the handicapped should be sufficient. Obligation of general public education must end at some point and other state responsibilities of higher education, vocational rehabilitation or habilitation should commence as the succeeding state responsibility to be conceptually provided in conjunction with whatever federal programs might, by authorization of the state legislature, be available.

It is unquestioned that since 1975, the EHA has transferred the personal responsibility of exceptional school age individuals from social services and state domiciliary facilities to the financing obligation of public education. What may have been the unmet responsibility in prior times is not ignored.[9] The specific subject of compensatory education to be provided past the public education age limitation authorized

---

**9.** The course of literary consideration is extensive as philosophically anticipating EHA and now assessing its progress. Minimal consideration has however been given in law review articles to the consequently endangered public education in systematic distress from mainstreaming and fiscal disenchantment with the cost benefit relationship derived from the receipt of federal funds.

Within the myriad of recent cases created by EHA, the arena of conflict issues most often developed result from the tension between twenty-four hour residential care and mainstream classroom utilization. Normally, the issue raises parental demand for whichever is the most expensive as related directly to the severity of the individual's handicap. Apparent in factual recitation among these cases, is the observable factor that where a severely handicapped condition exists, that resolution invokes family respite and child physical control in structured habilitation. Conversely, for those less severely handicapped in a life skill context, the cases raise the feasibility of use of local school and mainstreaming with individualized physical and educational attention. Representing the habilitation-residential controversies, see *Spielberg By Spielberg v. Henrico County Public Schools*, 853 F.2d 256 (4th Cir.1988); *Board of Educ. of East Windsor Regional School Dist. v. Diamond in Behalf of Diamond*, 808 F.2d 987 (3rd Cir.1986); *Parks v. Pavkovic*, 753 F.2d 1397 (7th Cir.), cert. denied 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653, cert. denied 474 U.S. 918, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); *David D.*, 775 F.2d 411; *Matthews By Matthews v. Davis*, 742 F.2d 825 (4th Cir.1984); *Abrahamson v. Hershman*, 701 F.2d 223 (1st Cir.1983); *Doe*, 692 F.2d 800; *Hendry*, 498 So.2d 566; *Taglianetti by Taglianetti v. Cronin*, 143 Ill.App.3d 459, 97 Ill.Dec. 547, 493 N.E.2d 29 (1986); *Parks v. Illinois Dept. of Mental Health*, 110 Ill.App.3d 184, 65 Ill.Dec. 695, 441 N.E.2d 1209 (1982); *Levine*, 418 A.2d 229; *Semel v. Ambach*, 118 A.D.2d 385, 505 N.Y.S.2d 466 (1986); *Martin*, 3 Va.App. 197, 348 S.E.2d 857; and *Hunter on Behalf of Hunter v. Seattle School Dist. No. 1*, 46 Wash.App. 523, 731 P.2d 19 (1987).

Cases conversely presented involving desired mainstreaming or utilization of local schools which sometimes require special attention including physical therapy and tutoring, etc. are *DeVries By DeBlaay v. Spillane*, 853 F.2d 264 (4th Cir.1988); *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290 (7th Cir.1988) (petition for certiorari filed 8/29/88); *A.W. By and Through N.W. v. Northwest R–1 School Dist.*, 813 F.2d 158 (8th Cir.) cert. denied — U.S. ——, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987); *Gregory K. v. Longview School Dist.*, 811 F.2d 1307 (9th Cir.1987); *Mark A. v. Grant Wood Area Educ. Agency*, 795 F.2d 52 (8th Cir.1986), cert. denied 480 U.S. 936, 107 S.Ct. 1579, 94 L.Ed.2d 769 (1987); *Roncker*, 700 F.2d 1058; *Powell v. Defore*, 699 F.2d 1078 (11th Cir.1983); and *Springdale School Dist. No. 50 of Washington County v. Grace*, 693 F.2d 41 (8th Cir.1982), cert. denied 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983).

The variability of results demonstrates the difficulties engendered when first the basic function of education is expanded to medical treatment and rudimentary living training, while the management and discretion in complex concerns of family, society and habilitation move from the educational institution to adjudicative responsibilities of the court to be weighed and packaged by a preponderance of the evidence.

Litigative expenses which have mushroomed for school districts in the past two decades as involving personnel controversies have now obtrusively moved with the heavy costs involved into the handicapped education programming. *Rollison v. Biggs*, 656 F.Supp. 1204 (D.Del.1987); Guernsey, *The School Pays the Piper, But How Much? Attorneys' Fees in Special Education Cases After the Handicapped Children's Protection Act of 1986*, 23 Wake Forest L.Rev. 237 (1988); Cohen and Jones, *The Handicapped Children's Protection Act of 1986: Congress Awards Attorneys' Fees to Handicapped Children*, 17 J.L. & Educ. 127 (1988); Note, *Congress, Smith v. Robinson, and the Myth of Attorney Representation in Special Education Hearings: Is Attorney Representation Desirable?*, 37 Syracuse L.Rev. 1161 (1987); Annotation, *Award of Attorneys' Fees Pursuant to § 615(e)(4) of the Education of the Handicapped Act (20 USCS § 1415(e)(4)), as Amended by the Handicapped Children's Protection Act of 1986*, 87 A.L.R.Fed. 500 (1988).

in statutes and constitution has developed a checkered pathway as in part inflicted by consideration of the United States Supreme Court discussion in *Burlington*, 471 U.S. 359, 105 S.Ct. 1996 and last raised by reference in majority opinion in *Honig*, 108 S.Ct. 592. Intertwined in application of this aspect of the individual's education is the applicability of statutes of limitation, since otherwise, a potential exposure would continue during the nineteen years when the student might be exposed to public education as finitely and finally reassessed at the limitation age which, in Wyoming, is the twenty-first birthday.[10] This court will follow that application of the Wyoming Constitution and statutes for denial of compensatory education past the foreclosing age which is buttressed by well-reasoned and persuasive consideration of the Nebraska Supreme Court. See *Monahan*, 425 N.W.2d 624 and *Deist*, 334 N.W.2d 775. See also on state law application, although not specifically addressing upper age limitations, *Levine*, 418 A.2d 229.

The Nebraska Supreme Court in last reference in *Monahan*, 425 N.W.2d at 628 (quoting *Deist*, 334 N.W.2d at 786), stated:

> "Turning to the issue of compensatory education, we find no support for the findings of \the hearing officer in the relevant law. The [Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401 et seq. (1976)], by its clear and unambiguous language, limits eligibility to children ages 3 to 21. § 1412(2)(B). There is no authority under this statutory scheme by which the hearing officer could grant free appropriate public educational benefits to David beyond his 21st birthday."

We do not interpret *Honig*, 108 S.Ct. 592 and *Burlington*, 471 U.S. 359, 105 S.Ct. 1996 to require contrary results when the application would require this court to use an administrative agreement to vitiate state statute and constitution. This posture is supported in comment by majority opinion of now Chief Justice Rehnquist in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 25, 101 S.Ct. 1531, 1544, 67 L.Ed.2d 694 (1981), where in considering the accepted facets of federal fund receipt by the state, he surmised in another context:

> [I]t is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment. The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice.

Without legislative approval, it is apparent that the state did not intend to assume conjecturally an indefinite educational responsibility beyond the statutorily established and constitutionally defined age of twenty-one. We would note that singular discussion and significant dispute in precedent is available. *White v. State*, 195 Cal. App.3d 452, 240 Cal.Rptr. 732, 736–37 (1987), where the court additionally found systemic exclusion from the EHA while resident in a state hospital as the "systemic denial of a free appropriate public education * * * caused by the illegal allocation of EHA funds;" *Stock v. Massachusetts Hosp. School*, 392 Mass. 205, 467 N.E.2d 448 (1984), cert. denied 474 U.S. 844, 106 S.Ct. 132, 88 L.Ed.2d 109 (1985), where supporting state law to afford continued educational eligibility was found. The variant results achieved with diversified factual situations when the federal court forum was chosen does not alter our application of controlling principles for Wyoming law.[11]

---

**10.** At present, the exposure would not realistically commence at a date prior to the 1975 passage of EHA.

**11.** See *Alexopulos By Alexopulos v. Riles*, 784 F.2d 1408 (9th Cir.1986) and *Powell*, 699 F.2d 1078 (no compensatory education allowed). Cf. *Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853 (11th Cir.1988); *Miener By and Through Miener v. State of Missouri*, 800 F.2d 749 (8th Cir.1986); *Timms v. Metropolitan School Dist. of Wabash County, Ind.*, 718 F.2d 212, as opinion was withdrawn and restated as 722 F.2d 1310 (7th Cir.1983); *Miener v. State of Missouri*, 673 F.2d 969 (8th Cir.), cert. denied 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171, cert. denied 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982); *Campbell v. Talladega County Bd. of Ed.*, 518

This decision does not leave the student and parents without remedy. The handicapped educational system by federal persuasion and state regulation contemplates a bilateral right for discussion and an empirical right to hearing and judicial review in case of the absence of mutual agreement or acceptability as to the level of education being provided. Essentially, this is what occurred in this case as resulting in the 1981 hearing and subsequent decision, *which was accepted by all parties.* Whatever rights for corrective opportunity may exist under the Wyoming Constitution and public education statutes, compensatory education past age twenty-one is not included in substance, text or by construction of what the legislative branch of state government has authorized or what the judicial branch of this state may provide.

F.Supp. 47 (N.D.Ala.1981); and Comment, supra, 1984 Wis.L.Rev. 1469.

**12.** As stated in the hearing officer's findings of fact, the hearing officer found:

In view of evidence and testimony, this impartial hearing officer finds that Respondent has acted in bad faith in an egregious manner to deprive Petitioner of the free appropriate public education to which he was entitled and in so finding, I find for Petitioner on this issues.

It is interesting that in those numerous cases now presented and regularly accruing, Devereux, in its various facilities in different locations, is the desired habilitation placement and subject of request and controversy of the parents in a significant number of cases. Thus far, no other case has come to our attention as cited or reviewed where the issue of retention in BRI was presented. The parents for DM categorically reject the sufficiency of Devereux, which has been found by other courts to be not only an appropriate but required placement. *Manecke v. School Bd. of Pinellas County, Fla.,* 762 F.2d 912, reh'g denied 770 F.2d 1084 (11th Cir.1985), cert. denied 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986); *Christopher T. v. San Francisco Unif. School Dist.,* 553 F.Supp. 1107 (N.D. Cal.1982); *Semel,* 505 N.Y.S.2d 466; and *Bucks County Public School Intermediate Unit No. 22 v. Com., Dept. of Educ.,* 108 Pa.Cmwlth. 511, 529 A.2d 1201 (1987). Cf. *Diamond,* 808 F.2d 987, where the student was once placed in BRI by his parents for a short time but the litigative controversy involved special school placement in the May Institute, which is undefined as to whether located in the residence state of New Jersey.

It is apparent that EHA has created a singular opportunity for domiciliary twenty-four hour maintenance with life skill training and edu-

## VI. ADVERSE FINDING OF FACT

■ Inquiry will not end at this juncture where our review is presented with a finding of the administrative hearing officer now to be considered in first judicial analysis that educational "deprivation" was the result of willful bad faith. That deprivation was found in cause and result by the 1979 removal from BRI for enrollment in Devereux Foundation, which as compensable deprivation continued until return to BRI since placement in other institutions was not thereafter mutually acceptable. We reverse the decision of the hearing officer as factually unsupported by the entire record that the educational efforts of the School District demonstrated "willful bad faith." [12] This complex, convoluted and confused record [13] reflects disagree-

cation institutions. The cost of funding is recognized in limitations of placement in some states and by development of multi-district institutions. See *Sykes v. Lincoln County School District No. 1,* 763 P.2d 1263 (Wyo.1988).

**13.** It is difficult to establish of what the actual record as presented for review may consist. There is a pleading volume in district court and a hearing testimony transcript of three volumes. Not included anywhere, although actually "stipulated for introduction," is a transcript of the August 1981 hearing. The 1987 hearing appears by six volumes. Volume I of 236 pages is the apparent administrative hearing pleadings, although obviously not all of the communication with the hearing officer is included. Volumes II, III and IV are 361 numbered School District exhibits which are described in an exhibit list of fifty-seven pages which, in itself, is narrative in nature but was not a listed exhibit. Nothing of record clearly reflects admission or rejection of these exhibits, except for four items that were specifically offered and received plus the earlier hearing transcript which was received but was not provided. Volume V of the record is four boxes of documents consisting of school records whose relationship to introduction is indeterminate, except counsel for DM said during hearing that he would stipulate to introduction if requested by the School District's attorney—which request was not made. To add some question to the circumstance, each of these five boxes, although duly marked as exhibits by both district court and the supreme court offices, arrived with stick on slips as underlined with the legend: "Do Not Take This Box." The total of this material as lacking organization and demonstrating much redundancy offers evidence of the history of the educational effort

ment on many technical and practical questions, extreme personality reactivity of some of the participants, distinguishable concerns in allocation of financing and system responsibility for each and also all students in public education, but in no regard bad faith on the part of the school board members, Robert G. Jorgenson, Joanne Christensen, Jonnie Burton, Mary Helen Hendry, Bill Hollingsworth, George Tenant, Joanne L. Street, Joan Sutherland or J. Scott Hocker or School District employees, including school superintendent, Dr. Jacob Dailey, and legal counsel whose pathway is well-documented. Nothing in the record relates to intimated or asserted bad faith of the State Department of Education.

With tuition expenditures by the School District now substantially exceeding $600,-000 for DM, this record is noteworthy not only in demonstrated time, difficulty and expense for all participants, but also in highlighting the broad conceptual issues of public education.

Issues, questions, contentions and philosophy are specifically marshalled under this dual hearing record (1981 and 1987) as including the diverse concepts of trainable versus educable responsibilities of public education, cost benefit criteria as a system responsibility to the exceptional student, maintenance and personal care of training as a responsibility of education, and limitations of educational capabilities as a factor of responsibility. Also intertwined are points of damage to the operational system from behaviorally uncontrolled participants, responsibility for education of twenty-four hours a day, 365 days a year for maintenance of some students, use of designated milieu therapy in a twenty-four hour environment as an educational and training quotient, and levels of appropriate aversive techniques available to school systems in living skill training programs as otherwise constituting physical abuse to the recipients. Additionally involved are interests of transitional training responsibilities as the end of educational age responsibility is approaching, system responsibilities of state social services and the Wyoming State Training School for the maintenance quotient of the handicapped student's life program during the ages of five to twenty-one, extreme behavior modification (or modification of extreme behavior or modification of behavior by extreme methodology), and twenty-four hour a day structured individual care as educational component. Moreover, this context encompasses substance of twenty-four hour a day personal supervision, and more specifically appropriate here, basis of regulation of behavior involving the educational habilitation care provider of the excess use of physical aversives and misuse of food contingencies, and federal statutory preference for mainstreaming. Of course, the backdrop of variant and other variable issues which dynamically invade the responsibilities of school trustees to educate all of the students for constructing a basic foundation to maintain a democratic society is also present.[14] Intrinsic to the subject is

---

and progress in the total which exceeds 12,000 pages of documents. This court has accepted the responsibility since the entire "conglomerate" arrived by designation and without objection that the parties intended the administrative hearing to include the entire volume. Actually, in addition to the four introduced exhibits, there were only twenty-two other exhibits identified out of the 361 listed and among them were video tapes, which are not to be found here. Consequently, the decision of this court is made on the certified record as filed here.

**14.** We also find merit in the logic of *Hendry*, 498 So.2d at 568, where the Florida Court of Appeals stated in finding that the hearing officer abused its discretion by a sua sponte order of residential placement:

The hearing officer is limited to determining the appropriateness of the IEP. *Davis v. District of Columbia Board of Education*, 530 F.Supp. 1209 (1982). If the hearing officer determines that the school district's proposed placement is not appropriate, the hearing officer must remand the matter to the school district. In addition, he may recommend an appropriate placement. *Davis* at 1212. The hearing officer, in the instant case, exceeded his authority by sua sponte ordering a residential placement. Once he determined that the School Board's plan was inappropriate, he should have remanded the matter to the School Board. He could have attached his recommendation of residential placement.

It also seems clearly established that the hearing officer has no authority to require placement in an unapproved institution or incur a

the philosophic inquiry, which is the responsibility of the elected school trustees, to allocate resources for 13,000 students within a defined budget as questioning the degree that they can afford to spend $113,208 per year for one student. Academically involved is the individualized character of the institution desired by the parents, which was exceptional not only in distance and cost,[15] but in its administrative agency regulatory problems. Closer to home, educational system management and good faith exercised discretion cannot be disregarded in this review adjudication of asserted bad faith.

The record in striking detail establishes factually the evidentiary basis for the hearing officer's finding incorporated in numbers 20, 21, 22 and 23.

20. Petitioner's IQ found to be less than 35, mental age of 2 years and adaptive behavior level of one year, eight months as a result of testing done at BRI in September, 1985. The results of a test of adaptive behavior in November, 1986, indicate an adaptive behavior level of one year, seven months.

21. Study of data provided by BRI indicates that Petitioner's progress over time has been very slow. Testimony predicted that Petitioner will "at best" function in a highly supervised, sheltered workshop or "more likely" in a work activity center.

22. Petitioner will not be able to progress to a point of living independently. He will always be in a supervised environment. No such facilities exist in the State of Wyoming which can provide an appropriate work situation for Petitioner. Other states do provide such facilities.

23. There is nothing in Petitioner's reports, evaluations, or observations of him to indicate that he will demonstrate growth in mental age or adaptive behavior in the ensuing three years.

Conversely, there is absolutely no evidence which is not advocacy or conclusionary statements sufficient to sustain finding number 12.[16]

level of expenditures that are not acceptable to a state agency. The State of Wyoming apparently has neither the commonly applied process for limiting accreditation of out-of-state placements or in establishing a maximum limit for which obligation can be incurred in habilitation cost, as discussed in *Taglianetti*, 493 N.E.2d 29 and *Semel*, 505 N.Y.S.2d 466.

15. The hearing officer indicated that the entitlement money received by the State of Wyoming in 1987 was in excess of two million dollars. Those funds spread among the severely retarded, such as DM, would afford financing for less than twenty students. This would leave no funds remaining for assistance to the other handicapped students for whom eligibility exists in the Wyoming school system which, from normal statistics, would exceed 10,000 persons. Conversely, if each of those 10,000 students received anything close to equivalent monetary attention, there would be no funds remaining for maintenance of the educational system of the State of Wyoming. Within this premise could lie the political inquiry that unless the system can more reasonably distribute the costs, the State of Wyoming may not be able to afford participation in the federal program as risking the continuation of the State's public education institution as constitutionally required. Admittedly, this situation is novel since no other reported case as currently reviewed nationwide among the large number indicate a cost per student which approaches the million dollars evidenced here.

16. The primary expert witness for DM in the 1987 hearing in addition to Dr. Matthew L. Israel, Director of BRI, was Dr. George Lewis Blau, Associate Professor of Psychology at the University of Wyoming, who also practiced law part-time in the Casper law firm of Miller and Blau. In the 1981 hearing, Dr. Blau appeared in the attorney capacity as co-counsel for DM in the contested hearing, while five years later, he appeared as an expert witness with the principal scope of his testimony to encompass the events presented in evidence at the hearing when he acted as attorney. Within the factual circumstance of his current hearing testimony, was the statement that he "had not done an evaluation of the child" as admitted on cross-examination. However, he testified in detail, without reviewing school records except for video tapes since 1981, as to the insufficiencies and the ineffectiveness of what the School District did in the period 1979 to 1982. During this time also, after the termination of the first hearing, he made appearances before the School Board of Natrona County School District No. 1 as attorney for DM and his parents.

By his 1988 testimony, he stated:
A. Mr. McCrary, I need for you to understand that I really was assisting only in the limited areas of working with the psychological evaluations of [DM]. Ms. Thornton took on primary responsibility and did not share everything with me. I surely cannot refute your statement, but I surely cannot acquiesce to it, either.

12. Petitioner will be trained to a level of independence which will allow him to function in a sheltered workshop environment if his training continues at BRI for approximately three more years.

In this total record, there is a plethora of detail about DM's life skill adaptability and improvement during the School District's involvement of about fifteen years. Regardless of the challenge to techniques used by BRI, it is informative to analyze the comparable changes of recent time. This is possible, since BRI, as a very structured institution, operates with a very clear system and explicit record keeping for progress measurement. One of the goals reflected for DM upon return to BRI in 1982 was to learn to take a shower. At the hearing in December 1987, the school director provided the annual individualized educational program as invoked by "stay put" to be in effect for the year commencing December 1987 to December 1988, which is now in progress. The showering sequence of using soap, wash cloth and towel involved nineteen recognized actions or responses to the direction to "take a shower." The training system as a graduated guidance process contemplated zero to five separate "prompts" to complete the activity for each of the sequences, for a total maximum prompts in taking a shower of ninety-five.

In an *April 1986* assessment, it was reflected that DM should shower with a prompt total of *twenty-four of ninety-five*, 100% of the time, a six month objective reflected a prompt total of fifteen or less and a one year objective of seven prompts or less. This is only the very normal daily shower. In *June 1987*, the status was *eighteen* prompts, the six month objection of fifteen prompts, and the annual goal to be seven prompts. The hearing date *December 1987* report reflected the present status at that time:

PRESENT STATUS OF SKILL

1. [DM] showers with a *prompt total of 23* (of 95), 100% of the time.

SIX MONTH OBJECTIVE

1. [DM] will shower with a prompt total of 18 or less, 100% of the time.

ANNUAL GOALS

1. [DM] will shower with a prompt total of 12 or less, 100% of the time. [Emphasis added.]

The 1986 goal had not been achieved and a 1987 regression had occurred. A further review of activity comparisons between April 1986 and December 1987 similarly reveal a personal case plateau of improvements for explicit tasks of washing hands and combing hair, and no notable improvement or regression in washing face and shaving. Nothing in the sequenced documentation as found in this comprehensive record reveals a general level of current improvement in living skills. More striking, however, is the documentation which reflects an allocation of individualized instructional time of 5% to academics in 1987 as compared to 20% of four years earlier in 1983, or a decrease of 15%. The comparisons of the earlier to current times are self-care, 25% versus 20%; individual living 20% versus 20%; free vocational 5% versus 30%; language 20% versus 10%; academics 20% versus 5%; social skills 5% versus 10%; and physical education 5% versus 5%. What this factually demonstrates in the

Q. [Mr. McCrary] Didn't you earlier testify that you acted as co-counsel for the family in the prior due process hearing?

A. I think the correct testimony was that I acted as co-counsel in an advisory capacity and doing the arranging for the evaluation of the child by three psychologists and doing their direct evaluation; and then I believe I participated in the cross-examination of two individuals, Mr. Schwartz and an individual from the University of Wyoming. That I believe was the extent of my participation.

For example, I did not participate in writing any of the legal briefs, I did not participate in writing any of the legal arguments, and I did not participate in any of the formal arguments to the independent due process hearing examiner.

Under the circumstance evidenced and in the face of the general objection of the School District that the first hearing was concluded by decision and could not be a basis for the present bad faith finding, we would not attribute significant reliability to the testimony of Dr. Blau as utilized for the egregious bad faith conclusion. The opinion of the attorney in present expert testimony as he differs from the first hearing witnesses for the opposing litigant affords little weight for our present evidentiary decision.

recent period of "education" and "training" in BRI was that language and academics dropped from 40% to 15% as the student went from age eighteen to twenty-one. See *Matthews By Matthews v. Davis,* 742 F.2d 825 (4th Cir.1984), where the rented apartment and employed attendant reached the limit of achieved benefit.

To be perceived from this broadly venturing record encompassing a multitude of educational inquiries is the recognition of a required exercise of discretion by the management of a school district and the countervailing objection of a student to the conclusions made and actions taken. Unless this court embarks on a program of embargoing responsible citizen community participation in elected office public responsibilities, a deference is required to elected officials who make contested decisions upon exercised discretion, *Board of Educ. v. Wieder,* 72 N.Y.2d 174, 531 N.Y.S.2d 889, 527 N.E.2d 767 (1988), as different from egregious bad faith. In recognizing the tenant of public service to be of the essence in a democratic society, we determine that such a difference must be demonstrated by evidence which is clear, specific and persuasive. That test is not met in this record, and consequently such further findings as may have been factually made by the hearing officer to justify the compensatory educational program at a time now more than five years later than the challenged period are also factually and legally unsupported. After analysis of all of the evidence in this extensive record, this court both finds and determines that the School District has satisfied its educational obligation under EHA and Wyoming statutes to DM. *A.C.B. By Pearlman v. Denver Dept. of Social Services,* 725 P.2d 94 (Colo.App.1986).

## VII. COLLATERAL ESTOPPEL AND STARE DECISIS

The School District argues that the first hearing was determinative as to the relief to be granted, and that in compliance therewith, the School District was not further subject to additional penalization for compensatory education during the contested period as an issue neither raised nor determined at that time. The kinds of educational decisions and budgetary priority allocations which are encompassed within the subject, caution this court to avoid invitation to discuss this difficult subject which is not separately determinative for this decision.

## VIII. OTHER ISSUES

Two other broad issues were comprehensively briefed and assiduously argued in oral presentation before this court. The first was an argument presented by the School District of the undisclosed bias of the hearing officer. We simply note in rejection of consideration that documentation is lacking to afford a factual basis for analysis of the acidity of the argument presented.

The second argument of singularly greater validity also will not be addressed by virtue of the decision which we make. This is the quandary of the applicable statute of limitations for student compensatory rights derived from contended improper School District conduct in the period 1979 to 1982. *Adler By Adler v. Education Dept. of State of N.Y.,* 760 F.2d 454 (2d Cir.1985). This subject directly raises the applicability and validity of the Wyoming statute of limitations for rights derived from federal statutes, W.S. 1–3–115. Although the consideration of this statute by the very recent Tenth Circuit Court of Appeal case, *Trustees of Wyoming Laborers Health and Welfare Plan v. Morgen & Oswood Const. Co., Inc. of Wyoming,* 850 F.2d 613 (10th Cir.1988), deserves immediate attention by the Wyoming legislature, we decline present comment on the validity of that statute or other limitation statutes. Cf. *Spiegel v. School Dist. No. 1, Laramie County,* 600 F.2d 264 (10th Cir.1979). *Spielberg By Spielberg v. Henrico County Public Schools,* 853 F.2d 256 (4th Cir.1988); *Adler,* 760 F.2d 454; *Flavin v. Connecticut State Bd. of Educ.,* 553 F.Supp. 827 (D.Conn.1982); and Note, *Limitations Period for Actions Brought Under § 1415 of the Education for All Handicapped Chil-*

*dren Act of 1975,* LVI Fordham L.Rev. 725 (1988).

## IX. REMEDIATION

This is the third case currently considered in which the litigative process has effectively required a school district and the State of Wyoming to pay for extra-statutory and unjustified educational services based on the student's contention of the School District's extended responsibility past the twenty-first birthday. Since the hearing officer lacked jurisdiction to grant educational services which extend beyond Wyoming's constitutional and statutory authorizations, we find no basis for payment by application of either the "stay put" provisions of federal law, 20 U.S.C. § 1415(e)(3) (1982 ed. & Supp. IV 1986), or SBE Rule, § 84, "Status of Child During Hearings," beyond the date of the issuance of our mandate. *Janzen v. Knox County Bd. of Educ.,* 790 F.2d 484 (6th Cir.1986). Consequently, since DM is now beyond the age of twenty-one years, further obligation for the maintenance of educational benefits will be continued for DM only to the date when our mandate issues in this case. After that time, neither the School District nor the State Board of Education is afforded the obligation or opportunity to continue to expend these funds as if the individual has not yet achieved the age of twenty-one years. *Ryan,* 764 P.2d 1019 (Wyo.1988). "Stay put" and SBE Rule, § 84 end at age twenty-one unless this decision is reversed with supersession of the Wyoming statutes and constitution by federal authority.

Reversed and remanded to the district court to enter an order in conformity herewith.

